54 N.J. Super. 371 (1959)
148 A.2d 885
TOWNSHIP COMMITTEE OF THE TOWNSHIP OF LAKEWOOD, APPELLANT,
v.
LAKEWOOD WATER COMPANY AND BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1959.
Decided March 9, 1959.
*375 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Julius Cohn argued the cause for appellant.
Mr. Sidney P. McCord, Jr., argued the cause for respondent Lakewood Water Company (Messrs. Starr, Summerill & Davis, attorneys).
Mr. Howard T. Rosen, Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (Mr. David D. Furman, Attorney General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Respondent Lakewood Water Company filed a notice and statement with the Board of Public Utility Commissioners (Board) seeking an increase in its rates for water and sewer service. After a number of hearings the Board granted rate increases, but not in the amounts sought by the company. Lakewood Township appeals from that part of the order increasing sewer rates. It does not challenge the Board's finding that the existing rates are unjust and unreasonable in that they do not afford the company an opportunity to earn a fair return.
The sole ground of appeal is that the increase in sewer rates was unjustified because the company had not been rendering adequate and proper sewage service. In support of this claim the township adduced evidence that manholes located in Clover Street and Meadow Avenue, Lakewood, had overflowed early in April 1958, covering a considerable area of low ground with raw sewage. There was also testimony relating to the Ninth Street pumping station where raw sewage had been pumped through hoses to a swamp area lying at the rear of the station. It appears that this overflowing and pumping of raw sewage continued for a number of days. Pictures in evidence showed the existing *376 conditions. The photographer who took them  a life-long resident of the Lakewood area  said he could not recall a time when precipitation had been as heavy as it was between January and April 1958. This was the first time he had ever seen sewage in the areas described.
The township sanitation inspector, Conyers, substantially corroborated the photographer's testimony. He testified that the Meadow Avenue manhole had overflowed for many years. The sewer line between Meadow Avenue and Clover Street would break every winter despite attempts at temporary repair. The township also had had trouble previously with the pumping of sewage into the swamp. Conyers characterized the sewage system as inadequate and declared that it had been so during his 11 years as sanitation inspector. The sewer pipes had not been enlarged since the system was installed; in his opinion they were too small. Many of them were in need of repair, and ground waters were being absorbed through defective joints. There was a wooden sewer line in one part of the system that had been in use for some 40 years. Much of the trouble came from having two pipe lines, 12" and 16" in diameter, run into an 18" line, with the resulting backing up of sewage.
Conyers described how the utility company had placed cement blocks and sandbags over the manholes when they overflowed in April 1958, but this had done little good. In fact, two manholes in Meadow Street were still overflowing on the day before the hearing, April 27, 1958. The company had at his request spread a chemical over the exposed sewage, designed to kill bacteria. He testified to the obvious fact that raw sewage constitutes a health menace.
On cross-examination Conyers stated that at the time of the overflow Lakewood's hotels were crowded for the spring holiday season, and that he, too, could not recall so heavy a precipitation as occurred between January and April 1958. He also testified that there had been some trouble with local cesspools, but this was no more than normal. He had seen the sewers overflow even during winters when precipitation was relatively light.
*377 The Board also took the testimony of Assistant Sanitarian Higgs, of the State Department of Health, who appeared for the township. He had investigated the sewage overflow situation soon after it happened. At Clover Street, where the two main pipes formed a junction, the trouble had been "abated" by covering the top of the manhole with tar paper sheathing and sandbags, "effecting an almost airtight seal"; the raw sewage had been covered with a chemical to reduce odor and hasten dewatering. He also saw the overflow at Meadow Avenue and on the line leading over to Clover Street. At the Ninth Street pumping station sewage had been pumped into the swamp to relieve pressure on a 6" wooden main. To him it appeared that "they [the company] were doing everything in their power to straighten this situation up"  one manhole had already been attended to and, before he left, the Meadow Avenue situation was receiving attention.
On cross-examination Higgs testified that he had advised the township administrator that "the conditions creating the present situation were unparalleled and that a wait and see policy as to immediate progress might be in order." However, on redirect he said he had not investigated the history of sewage overflow for the preceding ten years, and had he known that sewage had overflowed in that period he would not have concluded that the April 1958 situation was "an unparalleled occurrence."
In its decision, determination and order, the Board made but a single reference to the matter of adequate service. It said:
"In connection with the latter point [rate base], and in support of a more general proposition that the Sewer Department does not furnish adequate service, the Township presented other witnesses. The testimony clearly shows that conditions did exist and that the service was improper. However, the testimony shows that the Company attempted to, and did, alleviate the situation as promptly as possible, and that the suggestion of the Assistant Sanitarian, Department of Health, State of New Jersey, was `conditions creating the present situation were unparalleled and that a wait and see policy as to immediate progress might be in order.'"
*378 The statement that the company "attempted to, and did, alleviate the situation as promptly as possible" obviously refers to the testimony given by the township sanitation inspector and State Assistant Sanitarian Higgs. Clearly, the company had done little more than take temporary measures to meet the emergency.
In his brief, counsel for the Board states that it is his understanding that the township "will acknowledge at the hearing that promptly after receiving the rate increase the company made extensive capital improvements in order to prevent any recurrence of the overflow." A similar suggestion is made in the company's brief. At the oral hearing counsel for the township admitted that some capital improvements had been made, but said he did not know whether they would prove effective.
The township's argument proceeds from the legislative mandate set out in R.S. 48:3-3, that "No public utility shall provide or maintain any service that is unsafe, improper or inadequate, * * *." This duty to provide safe, proper and adequate service is an element which the Board must take into consideration in determining what is a just and reasonable rate of return. N.J. Central Traction Co. v. Public Utility Board, 96 N.J.L. 90, 96 (Sup. Ct. 1921); Nichols, Ruling Principles of Utility Regulation  Rate of Return, 396 et seq. (1955). The relations between adequate, efficient service and a fair return are mutual and interdependent. In no event should the rate granted a utility "be more than the reasonable worth of the service supplied." Public Service Coordinated Transport v. State, 5 N.J. 196, 225 (1950); O'Brien v. Bd. of Public Utilities Comm'rs, 92 N.J.L. 587, 592 (E. & A. 1919), affirming 92 N.J.L. 44 and 61 (Sup. Ct. 1918). The burden of proof of showing that the proposed rate increase is just and reasonable is upon the utility company. R.S. 48:2-21(d). Central R.R. Co. v. Dept. of Public Utilities, 7 N.J. 247, 256 (1951).
Respondent Lakewood Water Company agrees that an examination into the quality of service rendered by a utility *379 is an entirely proper prelude to the establishment of a just and reasonable rate. It argues, however, that the quality of service which individual rate-paying customers receive is the paramount element to be considered; that no Lakewood resident appeared before the Board to complain, and that the record is barren of testimony indicating that sewage was at any time not properly being discharged from homes in the service area. The company takes too narrow a view of the matter. It is not enough that the sewer system receive sewage discharged by individual customers; the utility company must also convey that sewage through its pipes and to its disposal system or site in a safe, proper and adequate manner. Unless this is done, the public health, safety and welfare are seriously affected.
A review of the record indicates that there were no increases in the company's rates between 1927 and 1956. On June 30, 1955 the company filed a revision of its water and sewer tariffs, including new rules and regulations for sewer service. The Board decision, determination and order now before us refers to that application (Board of Public Utility Commissioners Docket 8766). It would appear that Lakewood Water Company acquired the property of its predecessor at receivers' sale in 1944. In the 12-month period ending March 31, 1955 its sewer operation resulted in a deficit of $22,656, or a loss of 3.78% on its alleged sewer system investment. The only complaint regarding service made at the hearing on the 1955 application related to water service; apparently nothing was said regarding the sewer service. The Board at that time concluded that the existing rates did not give the company a fair return; it disapproved the utility's proposed rate schedule as unjust and unreasonable, and as to sewer rates permitted an increase that would produce $69,241 in additional annual revenues so as to assure the company of a 6% return.
In the Board hearing which led to the order under appeal, the company represented that during the 1 1/2 years the increased rates granted on its 1955 application had been in effect, they had not produced revenues sufficient to give a *380 6% return on the sewer operation, particularly because increased expenses had not been offset by the additional income. The company stated that it contemplated an expenditure of some $260,000 in its sewer plant during 1958 and 1959, no portion of which was included in the rate base claimed in the current proceedings, and which expenditure might possibly result in a further request for increased rates. The Board found that $588,894 was a reasonable rate base for property used and useful in sewer operations  an increase of more than $100,000 over the $473,000 rate base it had established two years earlier, and obviously indicative of capital expenditures  and authorized the utility to file a schedule of rates which would produce $28,000 in additional sewer revenue annually. From all that appears, therefore, there would seem to have been no prior complaints regarding the sewer service, and the Board has twice realistically addressed itself to allowing a schedule of rates which it anticipated would produce a 6% return for the sewer operation. However, its decision in the present case leaves unclear just what consideration the Board gave to the vital element of safe, proper and adequate service in fixing the sewer rates.
It will be recalled that the Board finding was that the testimony had clearly established that the sewage overflow conditions "did exist and that the service was improper," and that the company had attempted to "alleviate" the situation as promptly as possible. As we have noted, this reference must have been to the temporary expedients employed to contain the sewage overflow, and not to improvements calculated to meet the basic situation, a good part of which was attributable to inadequate mains. The Board appears to have approved the suggestion of State Assistant Sanitarian Higgs that the conditions which created the April 1958 situation "were unparalleled," and that a wait-and-see policy would seem to be indicated. But that suggestion was based upon an investigation limited only to the conditions found in April 1958  the heavy precipitation during the preceding months and the large influx of holiday visitors. Higgs *381 admitted that he would not have reached the conclusion that the situation was an "unparalleled occurrence" had he known of sewage overflow during preceding years.
We recognize, of course, that the Board has a large measure of legislative discretion in the exercise of its rate-making power, controlled by the statutory standard. Atlantic City Sewerage Co. v. Bd. of Public Utility Comm'rs, 128 N.J.L. 359, 365 (Sup. Ct. 1942), affirmed on opinion, 129 N.J.L. 401 (E. & A. 1943). It is free to make "pragmatic adjustments which may be called for by particular circumstances." Ibid., 128 N.J.L., at page 368. Thus, it may under the facts adduced before it in a particular rate case conclude that the issue of adequacy of service is collateral and would so complicate the rate case that it should be taken care of upon complaint in a separate proceeding. In re Barnegat Water Co., 1930 P.U.R. Ann. 61 (N.J.P.U.C. 1929). On the other hand, the Board would be privileged, in a case where the utility had failed over a long period to provide safe, proper and adequate service and had flagrantly disregarded orders of the Board to improve that service, to refuse any rate increase as the most practical method of getting the utility to remedy the deficiency. N.J. Central Traction Co. v. Public Utility Board, above. Again, the Board might conclude that the inadequate service rendered was due to the company's need for additional revenues for capital expenditures, and determine that the withholding of rate relief might cause further deterioration in service. Elizabeth v. Bd. of Public Utility Comm'rs, 99 N.J.L. 496, 498 (E. & A. 1924), where it was said, "A starved utility is in no better position to render proper service than a starved horse or a motor car without fuel."
In yet another case of demonstrated inadequate service, where the utility promised to make necessary improvements, the Board might deny the application, granting leave to renew after it had had an opportunity to see if the improvements were carried out and the service made adequate and proper, In re Clayton-Glassboro Water Co., 5 P.U.C.R. *382 99 (N.J.P.U.C. 1917); or, where the utility admitted that the service could be improved but claimed financial inability to do so, the Board might allow only such rates as would represent the present value of the service, until such time as the service was made reasonably adequate. In re Plainfield Water Co., 1924D P.U.R. Ann. 489 (N.J.P.U.C. 1924); In re Middlesex Water Co., 1925A P.U.R. Ann. 1 (N.J.P.U.C. 1924). Finally, it might grant emergency rate increases on the condition that if the utility failed to render reasonable service the rates would be cancelled. Application of Standard Gas Co., 6 P.U.C.R. 757 (N.J.P.U.C. 1919); In re Ocean County Gas Co., 1919B P.U.R. Ann. 874 (N.J.P.U.C. 1918).
Clearly, the Board may exercise great flexibility in passing upon utility rates. It has often been said that there is a presumption in favor of the correctness and validity of its action, N.J. Bell Tel. Co. v. Bd. of Public Utility Comm'rs, 12 N.J. 568, 690 (1953), since the manner in which the Board exercises its rate-making power often involves a consideration of large questions of public policy or business wisdom. To this should be added the observation, however, that the presumption depends upon the strength of the reasoning by which it is supported. Public Service Gas Co. v. Bd. of Public Utility Comm'rs, 84 N.J.L. 463, 468 (Sup. Ct. 1913), reversed in part, 87 N.J.L. 581 (E. & A. 1914), but affirmed in toto on rehearing, 87 N.J.L. 597 (E. & A. 1915), and appeal dismissed, 242 U.S. 666, 37 S.Ct. 243, 61 L.Ed. 552 (1917). On judicial review this court will not substitute its independent judgment for that of the Board, but will confine its inquiry to the ascertainment of whether the evidence furnished a reasonable basis for its action. In re Greenville Bus Co., 17 N.J. 131, 137-138 (1954). It is our duty to weigh the evidence under the pertinent legal principles and determine whether the issue of granting the utility a just and reasonable rate of return has been properly considered and decided. In re N.J. Power & Light Co., 9 N.J. 498, 508 (1952).
*383 The opinion of the Board, as it stands, does not contain a flat determination as to whether or not the day-to-day sewage service being supplied by the company is safe, proper and adequate. One may, perhaps, infer that the Board was satisfied as to this, merely noting that the service during April 1958 had been improper because of the so-called "unparalleled situation" which the company sought to alleviate by temporary measures. However, an express finding to that effect is essential in light of the decisional law.
If we had nothing more before us than the passing single reference of the Board to the matter of adequate service, quoted earlier in this opinion, we would be inclined to direct that the rate increase be held in abeyance pending further hearing on the question of whether the sewer operation met the statutory standard of service. However, we have the representation made in the company's application to the Board that it was undertaking a $260,000 expenditure on sewer improvements during 1958 and 1959. We have the additional representation by counsel for the utility and by the Board's attorney that after receiving the rate increase the company undertook extensive capital improvements to prevent any recurrence of the overflow. Counsel for the municipality admitted at oral argument that such capital improvements had been undertaken, but he would not say just how effective they are.
In the circumstances, we will not disturb the sewer rates approved by the Board. However, we remand the matter to the Board for further hearing to be held after the close of the 1959 spring season, to investigate and determine whether the capital improvements have in fact been made, as well as their effectiveness. The Board will then file a supplemental report detailing its findings and making a determination as to whether the sewer service now provided is safe, proper and adequate. Upon the coming in of that report we will schedule further argument to determine whether the rates fixed are just and reasonable in the light of the service being provided.
Remanded to the Board with directions to proceed in accordance with this opinion.