IN THE MATTER OF THE PETITION OF ELIZABETHTOWN
WATER COMPANY FOR AN INCREASE IN RATES.

and

IN THE MATTER OF THE ANALYSIS OF EARNINGS OF
ELIZABETHTOWN WATER COMPANY.

ELIZABETHTOWN WATER COMPANY, RESPONDENT AND
CROSS-APPELLANT, v. NEW JERSEY BOARD OF PUBLIC
UTILITIES, APPELLANT AND CROSS-RESPONDENT.

Argued October 20, 1986—Decided June 29, 1987.

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Helene S. Wallenstein,* Assistant Deputy Public Advocate, argued the cause for appellant and cross-respondent Public Advocate (*Alfred A. Slocum,* Public Advocate, attorney; *Helene S. Wallenstein* and *Margery S. Golin,* on the briefs).

*Brendan T. Byrne* and *William R. Holzapfel* argued the cause for respondent and cross-appellant (*Carella, Byrne, Bain & Gilfillan,* and *LeBoeuf, Lamb, Leiby & MacRae,* attorneys).

*Richard B. McGlynn* argued the cause for *amicus curiae* New Jersey Utilities Association, Inc. (*Stryker, Tams & Dill,* attorneys; *Mark L. Mucci,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The questions presented in this case are: (1) whether an order issued by the Board of Public Utilities (BPU) postponing the effective date of a rate increase granted to Elizabethtown Water Company (Elizabethtown or company) in order to offset the company's overearnings from prior years constitutes retroactive ratemaking, and, if so, (2) whether the BPU has the authority to engage in this kind of retroactive ratemaking. The Appellate Division held that the BPU's order constituted retroactive ratemaking and that such ratemaking is impermissible, but remanded the matter to the BPU for further proceedings. 205 *N.J.Super.* 528 (1985). We affirm the Appellate Division

insofar as it held that the order constitutes retroactive ratemaking and that the BPU lacked authority to issue such an order, but modify the Appellate Division's judgment insofar as it remanded the case to the BPU.

I

Elizabethtown is a public utility water company subject to the regulatory jurisdiction of the BPU. On December 2, 1983, Elizabethtown filed a petition with the BPU for an increase of approximately $9.2 million in its rates for its 1984 operating year. The Public Advocate, Division of Rate Counsel (Rate Counsel), contested Elizabethtown's request and the matter was referred to the Office of Administrative Law (OAL) as a contested case.

At the OAL hearing, it was established that Elizabethtown charged rates that were previously set and approved by the BPU; that the company never collected unlawful or improper rates; that Elizabethtown had not departed from its filed tariff, but due to economic factors beyond its control, its earnings in 1982 and 1983 exceeded the return on equity previously authorized by the BPU for those years;[1] and that a downturn in the company's earnings for the year 1984 was foreseeable. On July 12, 1984, the Administrative Law Judge (ALJ) issued an initial decision granting Elizabethtown rate relief in the amount of $3.24 million. The ALJ's decision was sent to the BPU for its review and final Decision and Order.

---

[1] A utility may earn a rate of return in excess of that approved by the BPU if the utility's income and/or operating expenses are not correctly estimated when the BPU approves the utility's tariff. The goal in setting a tariff is to enable the utility to recover its expenses—e.g., operating costs, taxes, depreciation—and obtain a fair rate of return on its equity. Thus, in setting a tariff that will enable the utility to achieve a given rate of return, the BPU must correctly predict the utility's operating results for the given rate period. If these estimates prove to be incorrect, a utility can earn a rate of return greater or less than the rate of return that is authorized even though it charges the authorized tariff.

At about the same time as the OAL hearing, the BPU instructed its staff to monitor the earnings of various utilities under its jurisdiction. Pursuant to that directive, the BPU conducted an earnings analysis of Elizabethtown. On June 8, 1984, the BPU issued a report concluding that Elizabethtown had earned a return on average consolidated [2] equity of 16.96% in 1982 and 16.11% in 1983 [3] even though the utility was authorized to receive a return of only 14.5% in each of these years. The study projected that Elizabethtown would earn $2.2 million in excess of its allowed return between January 1, 1982, and July 31, 1984.

On June 28, 1984, Elizabethtown filed a response to the BPU's report. According to Elizabethtown, its return on average equity was less than that stated by the BPU. In addition, the company argued that it was extremely unfair for the BPU to consider the company's earnings in 1982 and 1983 without making adjustments for ten of the past thirteen years in which Elizabethtown received less than the rate of return authorized by the BPU.[4] Moreover, according to Elizabethtown, any at-

---

[2]The term "consolidated" is used to indicate that calculations include the equity and operating results of Mount Holly Water Co., a small subsidiary of Elizabethtown. "Unconsolidated" indicates that calculations do not include data from Mount Holly Water Co.

[3]These statistics were based upon data contained in Elizabethtown's 1982 and 1983 consolidated reports to shareholders. The BPU also calculated that Elizabethtown's return on unconsolidated equity was 17.04% in 1982 and 16.15% in 1983. These calculations were based upon data contained in Elizabethtown's and Mount Holly's quarterly reports to the BPU and Elizabethtown's quarterly reports to shareholders.

[4]The company provided the following information concerning earnings:

| Twelve Months Ending | Return On Average Equity | Return On Year End Equity | Allowed Rate of Return |
|---|---|---|---|
| Dec. 31, 1972 | 6.33% | 6.32% | 12.00% |
| 1973 | 10.44 | 10.18 | 12.00 |

tempt by the BPU to adjust future rates in order to compensate for past overearnings would constitute impermissible retroactive ratemaking.

Representatives of Elizabethtown and the BPU met during the ensuing weeks to discuss and attempt to settle the issues raised by the BPU's earnings analysis. On August 28, 1984, Chester A. Ring, 3rd, Executive Vice President of Elizabethtown, wrote a letter to the BPU purporting to set forth the results of these meetings. The letter states that the BPU and Elizabethtown agreed that the overearnings experienced in 1983 would be more than offset by the underearnings suffered in 1984. The letter also states that the parties agreed that Elizabethtown had overearnings of $1.15 million in 1982 and that these overearnings could be offset by "[a]pplying projected 1984 underearnings, in excess of amounts used to offset 1983 overearnings, against the 1982 overearnings" and "[e]xtending the date new rates go into effect." Based upon this last

| Twelve Months Ending | Return On Average Equity | Return On Year End Equity | Allowed Rate of Return | |
|---|---|---|---|---|
| 1974 | 6.78% | 6.76% | 12.00% | |
| 1975 | 9.60 | 9.44 | 12.50 | |
| 1976 | 14.10 | 13.57 | 13.50 | |
| 1977 | 11.04 | 10.38 | 13.50 | |
| 1978 | 9.48 | 9.41 | 13.50 | |
| 1979 | 12.30 | 12.04 | 13.50 | |
| 1980 | 12.38 | 12.14 | 13.75 | |
| 1981 | 11.29 | 11.15 | 14.50 | |
| 1982 | 16.31 | 15.69 | 14.50 | |
| 1983 | 15.50 | 14.29 | 14.50 | |
| May 31, 1984 | 13.80 | 12.86 | 14.50 | |
| Sept. 30, 1984 | 12.73 | 11.99 | 14.50 | [est.] |
| Dec. 31, 1984 | 11.53 | 11.42 | 14.50 | [est.] |

statement, Rate Counsel argues that Elizabethtown consented to a postponement in its rate increase. Elizabethtown denies this and points out that the same letter stressed the company's continued resistance to the BPU's position:

> The Company once again maintains its position that it would be inappropriate to isolate the earnings of 1982 without giving consideration to the low level of earnings in 1981 which produced a return on equity of only 11.15%. The combined earnings of 1981 and 1982, when averaged, produced a return on equity of 13.4% which is considerably less than that allowed by the Board. Further, the Company believes it would be unfair to make any adjustments for 1982 without making appropriate adjustments for that portion of the authorized rate of return that the Company did not achieve for the nine years prior to 1982.

On September 24, 1984, the BPU issued its final Decision and Order, which affirmed and modified the ALJ's initial decision. The BPU ordered a rate increase of $2.656 million.[5] While acknowledging that the Company had not been at fault in realizing excess earnings in 1982 and 1983, the BPU nevertheless concluded that the ratepayers should receive recognition for overearnings by the Company in the amount of $1.15 million. Moreover, the BPU concluded that the most appropriate way to compensate ratepayers for this amount of overearnings was to set off this amount against the rate increase awarded. Thus, the BPU concluded that it would

> hold the new rates found to be reasonable in this order in abeyance until the difference in revenues between those that would be received under the new rates, as against those received under current rates, equals $1.15 million. It is anticipated that this recovery should be completed on or about February 1, 1985; the date new rates shall be permitted to go into effect shall be subject to an accounting procedure agreed upon by petitioner, Board's Staff and Rate Counsel, which will determine the exact timing of the implementation of this rate order.

---

[5] "In conclusion, based upon the foregoing and the record in this proceeding, the Board *HEREBY FINDS* a rate base of $125 million, a rate of return of 10.9%, resulting in an overall income requirement of $13.627 million; the income deficiency is $1.259 million resulting from the deduction of test year utility operating income, as adjusted, in the amount of $12.368 million, from the income requirement. The resultant revenue deficiency to be reflected in higher rates, (according to the terms and conditions which we will specify herein with regard to our treatment of the earnings analysis question), is $2.656 million." BPU, *Decision and Order*, No. 8312–1072, at 6 (1984).

[BPU, *Decision and Order, supra,* at 7 (footnote omitted).]

Elizabethtown appealed to the Appellate Division and applied for interim relief. The Appellate Division granted the motion and ordered that the rate increase go into effect immediately. The order provided, however, that the rate increase would have to be refunded to ratepayers if the BPU's actions were upheld.

Subsequently, a majority of the Appellate Division reversed the BPU's decision and remanded the matter to the BPU for further proceedings. The Appellate Division held that BPU's deferral of the new rates constituted retroactive ratemaking in violation of *N.J.S.A.* 48:2–21(b)1, which provides that "the BPU shall fix rates which shall be imposed, observed and followed *thereafter* by any public utility. . . ." (emphasis added). Judge Coleman concurred in part and dissented in part. He expressed uncertainty whether the BPU's actions constituted retroactive ratemaking, but held that even if they did, such retroactive ratemaking is not prohibited if it benefits the ratepayer.

By virtue of Judge Coleman's partial dissent, Rate Counsel and the BPU appealed as of right. *See R.* 2:2–1(a)(2). The BPU also filed a petition for certification seeking reversal of the Appellate Division's judgment.[6] Elizabethtown filed a petition for certification on the issue of whether the Appellate Division erred in remanding the matter to the BPU. Certification was granted on both petitions, 104 *N.J.* 385 (1986); therefore all issues are before this Court.

## II

The BPU first contends that its action in this case does not constitute retroactive ratemaking, but "merely defers the implementation of a new increase prospectively." We disagree.

---

[6] Originally, both Rate Counsel and the BPU filed petitions for certification out of fear that the right to appeal arising from Judge Coleman's dissent would be limited to the issue of whether retroactive ratemaking is prohibited and not include the issue of whether the BPU's rate deferral order in this case constituted retroactive ratemaking. Rate counsel withdrew its petition for certification.

"Generally, retroactive rate making occurs when a utility is permitted to recover an additional charge for past losses, *or when a utility is required to refund revenues collected, pursuant to then lawfully established rates.*" *Chesapeake and Potomac Tel. Co. v. Public Serv. Comm'n of West Virginia*, 300 *S.E.*2d 607, 619 (W.Va.1982) (emphasis added); *see also State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Serv. Comm'n*, 585 *S.W.*2d 41, 59 (Mo.1979) (retroactive ratemaking is "the setting of rates which permit a utility to recover past losses or which require it to refund excess profits"); *In re Central Vermont Pub. Serv. Corp.*, 144 *Vt.* 46, 52, 473 *A.*2d 1155, 1158 (1984) (any "device that enables a utility to balance its accounts for a prior period of time by making a future adjustment to its rates" is retroactive ratemaking).

■ In this case, the BPU reduced rates that were otherwise just and reasonable by $1.15 million in order to offset "overearnings" of $1.15 million in 1982. This is plainly retroactive ratemaking, as demonstrated by the BPU's own language in its Decision and Order:

> The Board believes that the ratepayer must be made whole in compensation for a level of charges which, in fact, have exceeded the levels prescribed by the Board. Taking all these factors before us into consideration, the majority of the Board concludes that the ratepayers should receive recognition for over earnings by petitioner in the amount of $1.15 million.
>
> * * * * * * * *
>
> The Board further concludes that the most appropriate methodology to make the ratepayers whole with respect to this level of overrecovery, is to set off this amount against the level of rate increase awarded herein, which is necessary to give petitioner an opportunity to achieve in future a reasonable rate of return. We will therefore hold the new rates found to be reasonable in this order in abeyance until the differences in revenues between those that would be received under the new rates as against those received under current rates, equals $1.15 million. [BPU, *Decision and Order, supra,* at 7].

Regardless of semantics, the effect of the BPU's order is evident. Deferring Elizabethtown's new rates until an amount equal to the prior overearnings had been offset had precisely the same effect as granting an immediate increase and ordering the company to refund $1.15 million to ratepayers.

The BPU, itself, recognized in its Decision that it was ordering a refund of the past excess earnings for 1982 and 1983:

> *We further believe that we have the discretion to fashion reasonable methodologies to determine whether, in fact, overearnings have been achieved, to determine the level of over-earnings that should be accounted for, and to determine the method of refund.* The Board is not bound by any particular methodology so long as the methodology it selects is reasoanable.
> [*Id.* (emphasis added).]

Indeed, it ended its Decision by stating:

> Therefore, the rate increase permitted herein, will not be permitted to take effect until on or about February 1, 1985, *but in no event until verification of the amount of refund* has been resolved and tariffs filed in conformance with this order have been accepted, by further order of this Board. New rates pursuant to this order may not go into effect on February 1, 1985 absent further Board order.
> [*Id.* at 8 (emphasis added).]

We reject the BPU's argument that its actions were prospective. Future or present adjustments to offset earnings in prior rate years are, by any other name, retrospective. A contrary holding would effectively eliminate any prohibition against retroactive ratemaking because the BPU could simply defer the effective date of any rate increase rather than bill its action as a retroactive adjustment.[7]

### III

Having found that the BPU's action constituted retroactive ratemaking, we turn now to the primary issue in this case—whether this kind of retroactive ratemaking is prohibited. We hold that retroactive ratemaking is impermissible regardless of whether it favors the utility or the ratepayers.

██ The Legislature has endowed the BPU with broad power to regulate public utilities. *Township of Deptford v. Woodbury Terrace Sewerage Corp.*, 54 *N.J.* 418, 424 (1969). The BPU has considerable discretion in exercising those powers. *In*

---

[7]We agree with the Appellate Division that there is no merit to the BPU's contention that Elizabethtown consented to the deferment of the new rates by its letter of August 28, 1984. *See* 205 *N.J.Super.* at 535.

*re New Jersey Power & Light Co.;* 9 *N.J.* 498, 508 (1952). In reviewing actions taken by the BPU, the issue is whether the BPU exceeded the authority granted in its enabling statutes. *Public Serv. Coordinated Transp. and Public Serv. Interstate Transp. Co. v. New Jersey,* 5 *N.J.* 196, 214 (1950). Hence, we must determine, as stated by the Appellate Division, "whether the action of the Board violates legislative policies expressed or implied in the act governing it." 205 *N.J.Super.* at 536. Based on the statutory language, the statutory ratemaking scheme, and our prior decisions, we conclude that BPU's retroactive ratemaking in this case exceeded its legislative authority.

One of the BPU's most important functions is to fix "just and reasonable" rates.[8] *N.J.S.A.* 48:2–21b(1) provides that such rates "shall be imposed, observed and followed *thereafter* by any public utility" (emphasis added).[9] Other courts have held that statutes authorizing utility commissions to fix rates to be followed "thereafter" allow a public utility commission to set

---

[8]If rates are too low, they are "confiscatory of the utility's right of property," and if they are too high, they permit the infliction of "extortionate and arbitrary charges upon the public." *In re Intrastate Indus. Sand Rates,* 66 *N.J.* 12, 24 (1974).

[9]*N.J.S.A.* 48:2–21 provides:

* * * * * * * *

> Fix rates. (b) The board may after hearing, upon notice, by order in writing:
> 1. Fix just and reasonable individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage and other special rates which shall be imposed, observed and followed thereafter by any public utility, whenever the board shall determine any existing rate, toll, charge or schedule thereof, commutation, mileage or other special rate to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential. In every such proceeding the board shall complete and close the hearing within 6 months and enter its final order within 8 months after the filing of the order of the board initiating such proceeding, when such proceeding is on the board's own motion; or after issue is joined through the filing of an answer to a complaint, when such proceeding is initiated by complaint.

* * * * * * * *

rates prospectively only. *See Public Utilities Comm'n of Ohio v. United Fuel Gas Co.,* 317 *U.S.* 456, 464, 63 *S.Ct.* 369, 374, 87 *L.Ed.* 396, 401 (1943); *Pacific Tel. and Tel. Co. v. Public Utilities Comm'n,* 62 *Cal.*2d 634, 651, 401 *P.*2d 353, 363, 44 *Cal.Rptr.* 1, 11 (1965); *City of Miami v. Florida Pub. Serv. Comm'n,* 208 *So.*2d 249, 260 (Fla.1968).

Moreover, the general statutory procedures for setting rates embody the general rule that "utility rates are accorded prospective effect" only. *City of Plainfield v. Public Serv. Elec. and Gas Co.,* 82 *N.J.* 245, 252 (1980). *N.J.S.A.* 48:2-21(d) sets forth the procedure that the BPU must follow when a public utility petitions for a rate increase. Once a petition for increased rates is filed, the BPU may, by order, suspend the effective date of the proposed increase (i.e., continue the existing rates) for up to eight months while the case is pending. If the BPU does not order a suspension, the new rates go into effect as of the date stated in the utility's notice, which must be at least thirty days *after* the date of the filing. *N.J.A.C.* 14:1-6.15(a)(4) and *N.J.A.C.* 14:1-6.16(a) (emphasis added). Because the proceedings may take up to eight months, the Legislature has specifically empowered the Board to allow interim rate increases while the case is pending. *N.J.S.A.* 48:2-21.1. These interim rates are not binding. As a consequence, any temporary increase, pending the BPU's final decision, is subject to rebate by the utility. *In re Revision of Rates Filed By Toms River Water Co.,* 82 *N.J.* 201, 212 (1980).

Aside from these limited statutorily authorized refunds for interim rate changes, the Legislature has authorized the BPU to engage in retroactive ratemaking only in certain narrowly defined situations, not applicable to this case. *N.J.S.A.* 48:2-21.11 provides that if an electric utility recovers certain costs from an insurance carrier, legal action, or settlement, the recovery may be used to reduce the utility's rates. *N.J.S.A.* 48:2-29.3 and *N.J.S.A.* 48:2-29.4 provide that where the BPU has authorized a utility to collect a surcharge for a specified purpose, the BPU may require the utility to discontinue the

surcharge once the purpose has been achieved and may order the utility to refund any excess. Thus, as noted by the Appellate Division in this case, "when the Legislature has desired to authorize the Board to order refunds or reduce future rates by reason of past events it has expressly done so." 205 *N.J.Super.* at 540.

The Legislature's authorization of refunds in these carefully limited circumstances and the absence of such provisions in *N.J.S.A.* 48:2–21(b)1 indicate that the Legislature did not intend to and did not grant the BPU general authority to make rates retroactively. *See In re Niagara Mohawk Power Corp. v. Public Serv. Comm'n*, 54 *A.D.*2d 255, 257, 388 *N.Y.S.*2d 157, 159 (Sup.Ct.1976). ("Since the Legislature carefully authorized refunds in two defined instances, it is reasonable and logical to conclude that no general authorization to direct refunds was intended."); *South Carolina Elec. and Gas Co. v. Public Serv. Comm'n*, 275 *S.C.* 487, 490, 272 *S.E.*2d 793, 795 (1980) ("As the legislature has expressly authorized refunds in two specific instances, it is both reasonable and logical to conclude that no general authority to direct refunds was intended to be placed in the Commission.").

This statutory scheme reflects the well-settled rule that ratemaking is a legislative and not a judicial function. *In re Intrastate Indus. Sand Rates, supra*, 66 *N.J.* at 21; *Public Serv. Coordinated Transp. and Public Serv. Interstate Transp. Co., supra*, 5 *N.J.* at 214. By its nature legislative action operates prospectively and not retroactively. *Chesapeake and Potomac Tel. Co. v. Public Serv. Comm'n of West Virginia, supra*, 300 *S.E.*2d at 619. As Justice Holmes explained in *Prentis v. Atlantic Coast Line Co.*, 211 *U.S.* 210, 226, 29 *S.Ct.* 67, 69, 53 *L.Ed.* 150, 158 (1908):

Legislation ... looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future....

Therefore, not only the specific language of the statute, but also its legislative nature, discloses that the BPU's general

ratemaking authority may be exercised only prospectively. *In re Revision of Rates Filed By Toms River Water Co., supra,* 82 *N.J.* 201; *In re Lambertville Rates v. New Jersey Bd. of Pub. Utility Comm'rs,* 79 *N.J.* 449 (1979); *In re New Jersey Power & Light Co.,* 15 *N.J.* 82 (1954).

Additionally, we have recognized that retroactive ratemaking presents many formidable difficulties. "[T]he orderly processes of ratemaking are necessarily present and prospective if ratemaking is to be effective." *In re New Jersey Power & Light Co., supra,* 15 *N.J.* at 93. Indeed, in *In re New Jersey Power & Light Co., supra,* 15 *N.J.* at 92–93, which specifically overruled our prior decision permitting retroactive ratemaking, Chief Justice Vanderbilt stated:

> The fundamental defect of the *Hackensack* opinion [*Hackensack Water Co. v. Board of Public Utility Commissioners,* 100 *N.J.L.* 177 (E. & A. 1924) ] in its practical operation is that it requires the Board to look both forward and backward in rate-making when the orderly processes of rate-making are necessarily present and prospective if rate-making is to be effective. The decision would authorize just and reasonable rates for the present and future and then add thereto surcharges for the past errors of "a rate-making experiment." This point of view is inconsistent with the businesslike processes of rate-making that have received the approval of this court[.]

As we more fully explained in *In re Lambertville Rates v. New Jersey Pub. Utilities Comm'rs, supra,* 79 *N.J.* at 457:

> The problems in trying to give retroactive effect to a rate increase are formidable. Customers are constantly being added and dropped by a utility. Those who have paid their utility bills have a right to expect that they will not be surcharged for the same service at a later date. New consumers should not be called on to pay a present surcharge for service rendered prior to their becoming customers.

One problem that may result from allowing the BPU to retroactively order a refund to consumers every time the utility earns more than its rate of return is the potential disruption of the stability of the marketplace. As the United States Supreme Court explained in *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of West Virginia,* 262 *U.S.* 679, 693, 43 *S.Ct.* 675, 679, 67 *L.Ed.* 1176, 1183 (1923), a reasonable rate of return is set to (1) assure confidence in the financial soundness of the utility; (2) maintain and support the utility's credit;

(3) enable the company to attract the capital necessary to provide service; and (4) maintain the integrity of existing service. Testimony at the rate hearing indicated that Elizabethtown's bond rating improved as a result of the strong earnings in 1982 and 1983. An increased rating allows a company to attract more capital at lower rates. If the BPU were permitted to reduce the past earnings of a utility, investor confidence would be undermined and the utility would find more difficult to obtain the capital needed to maintain service. As one court has explained:

> We are satisfied that no utility could attract capital for expansion or replacement of its property and facilities, or for any other purpose, if the Commission could at one time fix rates for that utility and then at some later time rescind those rates retroactively, fix lower rates retroactively and require the difference to be refunded to the ratepayers. The law ... was not designed or intended to create chaotic conditions in the market where utilities, as well as other businesses go to obtain capital for their legitimate business purposes. [*Indiana Tel. Corp. v. Public Serv. Comm'n of Indiana*, 131 *Ind.App.* 314, 341, 171 *N.E.*2d 111, 124 (Ind.App.1960).]

Rate Counsel and the BPU assert, however, that the rule against retroactive ratemaking is intended to protect ratepayers, not utilities. Therefore, they argue that the rule does not prohibit retroactive ratemaking that favors ratepayers. While such an argument may seem appealing, close examination reveals that it is flawed.

We have not yet had occasion to enforce the prohibition on retroactive ratemaking against ratepayers. Nevertheless, we have commented that "of course this rule, of looking to the future and not the past, works both ways ... 'Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future.' " *In re Intrastate Indus. Sand Rates, supra,* 66 *N.J.* at 23 (quoting *Los Angeles Gas & Elec. Corp. v. Railroad Comm'n of California,* 289 *U.S.* 287, 313, 53 *S.Ct.* 637, 647, 77 *L.Ed.* 1180, 1197 (1933)).

The BPU's interpretation is antithetical to *N.J.S.A.* 48:2–21(b)1, which provides that rates shall be "just and reasonable"

and "shall be imposed, observed and followed *thereafter*" (emphasis added). There is no indication anywhere in the statute that this rule applies only for the benefit of ratepayers. Presumably that phrase means "just and reasonable" to the utility as well as the consumer. The Legislature in establishing the BPU intended to protect the utility and the ratepayer. Neither the ratepayer nor the utility benefits from the inherent unfairness and instability that results from general retroactive ratemaking.

In this case, retroactive ratemaking would be unfair to both the public and the company. Although Rate Counsel characterizes the BPU's action as benefitting ratepayers, it is more accurate to say that it benefits some ratepayers at the expense of others. Because people are continually moving into and out of the company's service area, not all of the people who purchased water in 1982 and 1983 will receive a refund and not all people who would benefit from lower rates were overcharged. Moreover, ratepayers who have lived in the service area since 1982 are not necessarily purchasing as much water now as they did in 1982 and 1983. For these reasons, the amount saved by a customer through reduced rates does not necessarily bear any relation to the amount by which that customer was "overcharged" in 1982 and 1983. In effect, those ratepayers who do not receive the entire amounts they were "overcharged" are subsidizing other ratepayers. *See In re Lambertville Rates v. New Jersey Bd. of Pub. Utility Comm'rs, supra,* 79 *N.J.* at 457.

The BPU gave no reason for cutting off its retroactive inquiry at 1982. Indeed, since the company earned *less* than its authorized rate of return during ten of the thirteen years spanning from 1972 to 1984, such a cutoff seems, at the minimum, unfair, and at the maximum, arbitrary. If a utility does not get the benefit of a surcharge when its rate of return is less than authorized, it should not be forced to reduce rates when the utility's rate of return exceeds that authorized. Indeed, applying retroactive ratemaking—both for and against

the utility—in this case would result in unfairness to the ratepayers who would have to pay surcharges for the under-earnings for ten out of the last thirteen years.

The BPU's decision to engage in retroactive ratemaking and to take into account only the last two years highlights the difficulty of achieving fairness with any method other than a prospective year-to-year evaluation of appropriate rates. Projecting revenue, costs, and debt-service—along with the rates they produce—is invariably an inexact science. Economic factors beyond the utility's control may reduce or increase revenues from the levels anticipated. The rates may prove to be too high or too low. But, as this Court has noted, that " 'is a risk of the business.' " *In re N.J. Power & Light, supra,* 15 *N.J.* at 88 (quoting *Georgia Railway & Power Co. v. Railroad Comm'n,* 278 *F.* 242 (D.Ga.1922) (emphasis omitted)).

Prospective ratemaking is fair to both the public and the utility. If the BPU determines that a rate previously determined reasonable becomes unreasonable, it has broad power to "[i]nvestigate upon its initiative or upon complaint in writing any matter concerning any public utility." *N.J.S.A.* 48:2–19a. *N.J.S.A.* 48:2–21(b)1 gives the BPU the power to, by hearing, "[f]ix just and reasonable individual rates ... whenever the board shall determine any existing rate ... to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential." In the present case, therefore, the BPU could have initiated a proceeding during the rate year to reduce Elizabethtown's rates prospectively, if the BPU felt that such action was warranted by its earnings analysis.

And, as we stated in *In re N.J. Power & Light Co., supra,* 15 *N.J.* at 93, prospective ratemaking

is fair to the public utility, for it can act as speedily as it sees fit to move for a correction of inadequate rates, and it is fair to the consumer in safeguarding him from surprise surcharges dating back over years that he had a right to assume were finished business for him and possibly over years when he was not even a consumer.

Other states with enabling statutes similar to that of New Jersey have held that the rule against retroactive ratemaking protects the utility as well as consumers. *See City of Miami v. Florida Pub. Serv. Comm'n, supra,* 208 *So.*2d 249 (rate reduction cannot be retroactive because a statute empowered the public utility commission to fix just and reasonable rates to be followed "thereafter"); *Mississippi Pub. Serv. Comm'n v. Home Tel. Co., Inc.,* 236 *Miss.* 444, 454, 110 *So.*2d 618, 623 (1959) ("It is generally held that neither losses sustained nor profits gained by a public utility in the past may be taken into account in fixing rates to be charged in the future"); *State ex rel. Utility Consumers Council of Missouri, Inc., v. Public Serv. Comm'n, supra,* 585 *S.W.*2d at 58 (public service commission cannot "redetermine rates already established and paid without depriving the utility (or the consumer if the rates were originally too low) or his property without due process"); *Niagara Mohawk Power Corp. v. Public Serv. Comm'n, supra,* 54 *A.D.*2d at 257, 388 *N.Y.S.*2d at 159 (public service commission "does not have the general power to order a utility to make reparation or refunds to its customers"); *North Carolina ex rel. Utilities Comm'n & Duke Power Co. v. Edmisten,* 291 *N.C.* 451, 468, 232 *S.E.*2d 184, 194 (1977) (a "utility company may not properly be denied the right to charge" a reasonable rate "for the present use of its service, for the reason that, in a preceding month, the utility earned an excessive rate of return. ..."); *South Carolina Elec. and Gas Co. v. Public Serv. Comm'n, supra,* 275 *S.C.* at 491, 272 *S.E.*2d at 795 ("The Commission has no more authority to require a refund of monies collected under a lawful rate than it would have to determine that the rate previously fixed and approved was unreasonably low, and that the customers would thus pay the difference to the utility."); *In re Central Vermont Pub. Serv. Corp., supra,* 144 *Vt.* at 55, 473 *A.*2d at 1160 ("unless authorized by statute, a rate that requires consumers to pay for past deficits of a utility or that requires a utility to refund to consumers a portion of its previously earned profits constitutes

458

illegal retroactive ratemaking"); *Chesapeake and Potomac Tel. Co. v. Public Serv. Comm'n of West Virginia, supra,* 300 *S.E.*2d at 619 (commission could not order utility to refund excess profits because it was empowered to "fix reasonable rates ... to be followed in the future"); *Friends of the Earth v. Public Serv. Comm'n,* 78 *Wis.*2d 388, 413, 254 *N.W.*2d 299, 309 (1977) (commission did not have power to order refund of amounts collected pursuant to a temporary order unless order specifically provided that a refund might be required).

Rate counsel relies heavily on *Narragansett Elec. Co. v. Burke,* —— *R.I.* ——, 505 *A.*2d 1147 (1986), in which the Supreme Court of Rhode Island held that the rule against retroactive ratemaking does not preclude a public utility commission from ordering refunds where a utility earns "well in excess of its authorized rate of return." The court said that the two functions of the rule against retroactive ratemaking are "to protect the public by ensuring that it will not be forced to pay past company deficits in future payments and also to prevent the company from employing future rates to ensure its stockholders' investments." *Id.* at ——, 505 *A.*2d at 1148.

The court's decision in *Narragansett,* however, was premised upon an enabling statute that is very different from *N.J.S.A.* 48:2–21. R.I.Gen.Laws § 39–3–11,[10] which sets forth the commission's power to fix rates, contains no prohibition on retroac-

[10]R.I.Gen.Laws 39–3–11 reads:

\* \* \* \* \* \* \* \*

Within ninety (90) days after the completion of any such hearing, the commission shall make such order in reference to any proposed rate, toll or charge as may be proper. Notwithstanding the provisions of this section, the commission shall periodically hold a public hearing and make investigation as to the propriety of rates when charged by any public utility and shall make such order in reference to such rate, toll, or charge as may be just. The hearing prescribed by this section may be held simultaneously with the hearing prescribed by § 39–3–7. In the event of any appeal from an order of the commission in any hearing under this section, such order shall remain in full force and effect during the pendency of said appeal.

tive ratemaking analogous to that contained in *N.J.S.A.* 48:2–21(b)1. Moreover, Rhode Island empowered its commission with broad power to order refunds:

> The division shall have the power, when deemed by it necessary to provide remedial relief from unjust, unreasonable, or discriminatory acts, or from any matter, act or thing done by a public utility which matter, act or thing is in chapters 1 to 5, inclusive, of this title, or otherwise prohibited or declared to be unlawful, to order the public utility to make restitution to any party or parties, individually or as a class, injured by said prohibited or unlawful acts * * *.
> [R.I.Gen.Laws § 39–3–13.1]

Furthermore, R.I.Gen.Laws § 39–1–38 provides:

> The provisions of this title shall be interpreted and construed liberally in aid of its declared purpose. The commission and the division shall have, in addition to power herein specified, all additional, implied and incidental power which may be proper and necessary to effectuate their purpose.

Significantly, in a case that arose before this broad refund provision became effective, the Rhode Island Supreme Court had held that the Public Utility Commission did *not* have the power to order a refund. *See Narragansett Elec. Co. v. Burke,* 122 *R.I.* 13, 404 *A.*2d 821 (1979). The court explained that " 'when a commission pronounces that a specific rate is a "reasonable and lawful rate for the future," that pronouncement has the force and effect of a statute.' " *Id.* at 22, 404 *A.* 2d at 827 (quoting *New England Tel. & Tel. Co. v. Public Utility Comm'n,* 116 *R.I.* 356, 388, 358 *A.*2d 1, 20 (1976)).

■ Based upon the statutory language, the statutory ratemaking scheme, the Legislature's very limited and specific authorization to the BPU to engage in retroactive ratemaking, and our prior decisions, we hold that retroactive ratemaking is prohibited regardless of whether such ratemaking benefits the utility or the ratepayer. When existing rates are insufficient to provide a fair rate of return, the proper remedy for the utility is to file an application for higher rates. *In re Revision of Rates Filed By Toms River Water Company, supra,* 82 *N.J.* at 213. If, through unforeseen circumstances, a utility earns profits that are deemed excessive, the proper remedy is for a BPU to initiate a proceeding to lower the rates prospectively.

It is within the purview of the Legislature to grant the BPU general retroactive ratemaking power. It has failed to do so. If the BPU seeks such retroactive ratemaking power, it must address its request to the Legislature, not this Court.

## IV

■ Rate Counsel argues that we should remand this case to the BPU because the amount of Elizabethtown's rate increase was inextricably linked to the refund it ordered the company to make. We find that the BPU's Decision and Order does not support this position.

Specifically, Rate Counsel argues that by deferring the effective date to February 1, 1985 the BPU authorized a greater increase than it would have approved if the increase had become effective immediately. Rate Counsel points to an affidavit by Anthony J. Zarillo, the BPU's Chief Executive Officer, which states that the BPU was concerned about the financial impact on the company of delaying the effective date of the increase. Mr. Zarillo states that in order to deal with this concern, the BPU extended the test year through July and accepted certain projected construction expenditures through September, to more closely match historical data with the time rates would be effective.[11] We disagree with Rate Counsel's argument that the amount of the rate increase was premised upon an effective date of February 1, 1985.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that the action was based[,]" *Securities and Exchange Comm'n v. Chenery Corp.*, 318 *U.S.* 80, 87, 63 *S.Ct.* 454, 459, 87 *L.Ed.* 626, 633 (1943), not an after-the-fact affidavit purporting to explain the administrative agency's decision. The BPU's order clearly indicates that the decision to extend the test year was based upon

---

[11]The parties had stipulated that a test year ending March 31, 1984, would be used. The BPU extended the test year to September 30, 1984.

well-established BPU policy to select a test year that is as current as possible:

Our conclusion in this regard does not enunciate a change in direction in the policy of this Board. In line with our past policy, the Board will select a test year which is as current as possible under the circumstances but which reflects actual test year data. In addition we will exercise our discretion to recognize known and measurable changes as the off [sic] stated policy of the Board from which we do not depart from [sic] in this case.

[BPU, *Decision and Order, supra,* at 2.]

The earnings analysis was merely an additional reason to extend the test year: "[s]ince new rates shall not become effective until on or about [February 1, 1985], we believe this is an *additional* reason to extend the test year to July 31, 1984...." *Id.* at 7 n. 2 (emphasis added).

Since the BPU has already concluded that a rate increase of $2.656 million is just and reasonable, we find no reason to remand this case to the BPU.

As modified, the judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

I believe that the correct resolution of the issues before us is to have the Board of Public Utilities Commissioners (BPU or Board) reconsider its rate resolution in accordance with the principles that the Court adopts. This is the basic approach that we have taken in other ratemaking cases, and it more accurately reflects the appropriate role of the courts in this essentially legislative process of ratemaking.

This case is not readily resolved by labeling the issue as one of retroactive ratemaking. What we basically have here is an administrative response to an extraordinary and nonrecurring set of circumstances. As a result of extreme drought in 1981 and parts of 1982, severe restrictions were imposed on the use of water in the utility's service area. These drought restrictions prompted the BPU to adopt water rate increases to stabilize water utility earnings. But as one Commissioner noted, when the drought eased, "[r]evenues increased dramati-

cally as the effects of the drought disappeared and higher usage returned." It was this dramatic increase in revenues that prompted the BPU's over-earnings analysis that is the pivotal issue in this case.

The majority and minority of the Board differed on the amount of the over-earnings but not the public policy issue. The Board did not fault the company for any lack of forecasting with regard to earnings, nor did it believe penalties in the form of interest or other sanctions were appropriate. "But [it found that] the imposition of state curtailments on water usage due to the drought, and the removal thereof, contributed to elastic, unpredictable usage patterns, along with the variable effects of rainfall." The Board concluded that "the ratepayers should receive recognition for over-earnings by [Elizabethtown] in the amount of $1.15 million." But the minority member of the Board calculated over-earnings, as did the staff, at $2.2 million and concluded that "the dominant portion of the overrecovery was caused by the Board's quick response to a state emergency [by raising water tariffs]. The sacrifices endured by the ratepayers merit a return in full for any overrecovery linked to the consequences of the worst drought in 100 years."

The question that the Board had to face was how to fairly resolve this vicissitude of weather. Should the water users who had suffered through the drought restrictions share in the providential cash windfall that had followed the rainfall? The Board believed that it had the statutory duty and flexibility to reconcile the interests of the utility and the ratepayers. As it viewed the issue, the Board concluded that "the most appropriate methodology to make the ratepayers whole with respect to this level of overrecovery, [was] to set off this amount against the level of rate increase awarded * * *, which [was] necessary to give [Elizabethtown] an opportunity to achieve in [the] future a reasonable rate of return." It therefore readjusted the test year upon which it was basing the projected increase, and held the new rates "in abeyance until the difference in revenues between those that would be received under the new rates, as

against those received under current rates, equal[ed] $1.15 million."

The Court finds this to be a forbidden methodology. In other words, the Board has applied what the Court now considers to be an incorrect principle of law in the context of the ratemaking process. I would follow in this case the policy that we followed in *Riverside General Hospital v. New Jersey Hospital Rate Setting Commission*, 98 *N.J.* 458 (1985). In that case, we recognized that the establishment of rates partakes of a legislative determination. Ordinarily in this complex area of ratemaking, "where the Legislature has delegated a great amount of discretion * * *, deference must be accorded to the administrative agency's expertise and experience in its domain." *Id.* at 469. We restated the limited scope of judicial review of administrative adjudication simply to be " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record * * *' with due regard also to the agency's expertise where such expertise is a pertinent factor." *Id.* at 468 (citations omitted). This requires only a "careful and principled consideration of the agency record and findings." *Ibid.* "There should be applied the time-tested precepts of judicial review of administrative action, that agency action proceed upon an evidential foundation and that the grounds of decision be fully revealed." *In re 1976 Hosp. Reimbursement Rate for Kessler Memorial Hosp.*, 78 *N.J.* 564, 577 (1979) (Handler, J., concurring). In *Riverside Hospital, supra,* when the grounds of decision were not fully revealed, we accorded due deference to the expertise of the ratemaking agency and directed the Hospital Rate Setting Commission "to conduct another hearing in which it should examine the facts, carefully apply the pertinent regulations, and clearly set forth its conclusions." 98 *N.J.* at 473.

I would do that here. Our statutory jurisdiction is sharply limited under *N.J.S.A.* 48:2–46 to setting aside orders of the Board when it "clearly appears that there was no evidence before the board to support the same reasonably or that the

same was without the jurisdiction of the board." It simply cannot be said that the order was outside the jurisdiction of the BPU. The evidence is clearly there to support its order. In fact, we do not have before us any dispute that there were over-earnings during the relevant period, although there is dispute as to the exact amount. The only thing that we are concerned about here is the rationale adopted by the BPU for its decision. And on that point, the Board's view was that it was not ordering a refund but instead was allowing the utility to even out the rate of return on its prior tariff. It adjusted that return to recognize that the utility would decline in performance in 1984. Although not concurring in the wisdom of the decision, Elizabethtown seemed to believe that the methodology was within the Board's power. A company official discussed the proposed procedure as follows:

> 1982 overearnings in the amount of $1,150,000 was agreed upon by the Staff and the Company. The Company believes that this amount can be offset in the following manner:
>
> a. Applying projected 1984 underearnings, in excess of amounts used to offset 1983 overearnings, against the 1982 underearnings;
>
> b. Extending the date new rates go into effect.

The methodology is at least debatable. In *In re Lambertville Rates v. New Jersey Board of Public Utility Commissioners*, 79 *N.J.* 449, 457 (1979), Justice Sullivan noted the extraordinarily broad discretion of the Board to "fix an effective date" for rate increases. He noted the policy underlying prospective ratemaking, by reference to retroactive ratemaking, thus:

> The problems in trying to give retroactive effect to a rate increase are formidable. Customers are constantly being added and dropped by a utility. Those who have paid their utility bills have a right to expect that they will not be surcharged for the same service at a later date. New consumers should not be called on to pay a present surcharge for service rendered prior to their becoming customers. [*Ibid.*]

The point is that whatever the methodology, the Board should exercise its statutory charter within the limits found by the Court.

In the absence of a constitutional claim of confiscation, all that is required is that the rate of return established by the Board be sufficient "to permit the company to maintain its financial integrity, attract capital needed to serve the public, and provide a return to the equity owner commensurate with the returns on investment in other enterprises having corresponding risks." *New Jersey Bell Telephone Co. v. State*, 162 *N.J.Super.* 60, 73–74 (App.Div.1978) (citing *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 *U.S.* 591, 64 *S.Ct.* 281, 88 *L.Ed.*2d 333 (1944)). See *Bergen Pines County Hosp. v. Department of Human Serv.*, 96 *N.J.* 456, 478 (1984) (citing *New Jersey Bell Telephone Co., supra,* 162 *N.J.Super.* 60, with approval and according deference to the Board's determination). Conceptually, I suppose, the basic question is what rate of return is necessary to maintain investor confidence in a utility that has accumulated significant operating profits from an extraordinary sequence of events.

Viewed within that frame of reference and the narrow scope of judicial review of agency ratemaking, the question is whether the Court should determine the rate that is necessary to "maintain financial integrity[ ] [and] attract capital needed," or whether the Board should be permitted to reconsider the issue in light of the legal principles that we now hold to be applicable. Ordinarily, within its constitutional and statutory confines, a ratemaking agency is "free to make 'pragmatic adjustments which may be called for by particular circumstances.'" *Township Comm. of Lakewood v. Lakewood Water Co.*, 54 *N.J.Super.* 371, 381 (App.Div.1959) (quoting *Atlantic City Sewerage Co. v. Board of Public Utility Comm'rs*, 128 *N.J.L.* 359, 368 (Sup.Ct.1942), *aff'd o.b.*, 129 *N.J.L.* 401 (E. & A. 1943)).

As noted, there is a linkage between the methodology employed by the BPU and its ultimate decision. In fact, the caption of the case itself bespeaks the linkage, embracing the combined aspects of the administrative determination ("Increase In Rates" and "Analysis of Earnings"). The Court now has split the two aspects of the agency action. The Public

Advocate asserted before the Appellate Division that the actual rate increase (about $2.6 million) was established, but premised on the knowledge that the increase would be postponed "resulting in a higher level of rates than would have been authorized had the Board contemplated a September, 1984 effective date." Elizabethtown counters this by arguing that the $2.6 million hike independently was found to be just and reasonable regardless of the effective date. The Appellate Division agreed with the Public Advocate and remanded the case even though it found "difficult to support on the record" the Public Advocate's contention that the approved rates were intertwined with the deferral. 205 *N.J.Super.* 528, 541 (1985). The Appellate Division nevertheless concluded that it "should not in the first instance pass on the issues" not raised before the Board, and thus remanded the case. *Ibid.*

The BPU, and not the courts, is charged with fixing appropriate rates. *In re Intrastate Industrial Sand Rates,* 66 *N.J.* 12, 19–20 (1974). If the Court invalidates the deferral methodology, and if the deferral did enter into the rate calculation for 1984–1985, then the approved rates are in fact excessive. At the least, the Board should be permitted to make a record on its contentions that 1) in conformity with the methodology seemingly concurred in by Elizabethtown, it reduced the over-earnings figure in recognition of both the company's 1984 decline in financial performance and the potential for further earnings erosion; 2) the Board extended the test year from March 31, 1984, to July 31, 1984, to match more closely historical data with the time when rates would become effective; and 3) it also accepted the utility's projections of routine construction expenditures through September 30, 1984, with the result that Elizabethtown's "financial integrity [was] better under the Board Order incorporating the overearnings question than it would have been under an award [not incorporating overearnings and] effective in September but based on the agreed upon test year."

We were informed at oral argument that the amount in controversy has decreased during the course of the litigation, and now the matter may be much more amenable to resolution.

*For modification and affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6

*For reversal* —Justice O'HERN—1.