Robert G. TAYLOR, Appellant–Plaintiff,

v.

FALL CREEK REGIONAL WASTE DISTRICT, Appellee–Defendant.

No. 48A02–9802–CV–195.

Court of Appeals of Indiana.

Oct. 27, 1998.

Frank E. Gilkison, Marianne L. Vorhees, Beasley Gilkison Retherford Buckles & Clark, Muncie, William Byer, Sr., Byer & Byer, Anderson, for Appellant–Plaintiff.

Ronald E. Elberger, George T. Patton, Jr., J. Christopher Janak, Bose McKinney & Evans, Indianapolis, for Appellee–Defendant.

## OPINION

HOFFMAN, Senior Judge.

Appellant-plaintiff Robert G. Taylor appeals from a grant of summary judgment in favor of Fall Creek Regional Waste District (Fall Creek) in an action establishing the validity of two ordinances adopted by Fall Creek on February 29, 1996, imposing a "capacity fee" and a "tap fee" for new connections to its sewer system. The facts relevant to our review are recited below.

Fall Creek Regional Waste District ("Fall Creek") is a duly organized and operating regional waste district, pursuant to IND. CODE § 13–26–1–1 *et seq.*, that operates a wastewater collection and treatment system. Taylor is a developer and builder who owns real estate in two different additions connected to Fall Creek's sewage system and conveyed in fee simple from Taylor to purchasers of the tract, free and clear of any and all utility liens. Fall Creek's ordinances require Taylor to convey the sewers he constructs to the Fall Creek Regional Waste District.

Fall Creek completed the initial construction of its wastewater treatment and sewage disposal system in 1986. Although there have been improvements to the system since 1986, including the extension and installation of sewage disposal facilities necessary to serve developments such as Taylor's, a significant portion of the system constructed in 1986 is used to provide service to Fall Creek's present customers.

Fall Creek entered into four separate agreements for each phase of the initial construction. Specifically, Fall Creek had a separate agreement for the installation of the sewage collection systems in the Ingalls Basin, Pendleton Basin, and South Anderson Basin, and a separate agreement for the construction of the wastewater treatment plant. In 1986, the system was constructed to provide extra capacity for anticipated future use at a total cost of approximately $16,702,000. Due to severe environmental problems, state and federal agencies contributed grants totaling $12,002,433 on behalf of the initial customers; the remainder of the sewage system was funded by the issuance of $4,700,000 in bonds.

Since its inception, Fall Creek had in place a connection fee payable by all properties connecting to its system. In 1992, Fall Creek increased its connection charge to include the cost of availability or capacity which must be reserved for each customer connecting to Fall Creek's system.

On February 29, 1996, Fall Creek adopted Ordinance No. 96–3, entitled "Ordinance Establishing Capacity Fee." The ordinance requires the payment of a capacity fee by all individuals seeking to connect to Fall Creek's system. In part the ordinance provides:

> After adoption of the Ordinance, the District shall not allow final and permanent connection to the District's sewage facilities of any real estate producing wastewater by any owner of real estate until a permit is obtained and payment has been made to the District for the appropriate capacity fee.

Ordinance No. 96–3. The purpose of the fee is to insure that new users paid for the privilege to use the facilities that are already in place.

Prior to enacting Ordinance No. 96–3, Fall Creek directed Triad Associates, Inc. to per-

form an analysis to determine the cost of constructing the facilities necessary to provide service to the residents within Fall Creek's service area. Triad used the original 1986 construction cost as the basis for determining the cost of the facilities necessary to provide service to Fall Creek's customers. By calculating the total cost of constructing the original collection and treatment system, and dividing the total cost by the number of customers, Triad determined the cost of facilities contributed to and used by Fall Creek's initial customers.

Each of the three Basins serviced by Fall Creek was assigned a reflective percentage of their total "hook-ups" or initial customers. Triad then prepared an itemized report summarizing the cost for the initial customers in Fall Creek's three service areas. After receiving the report, Fall Creek hired Vinton G. Dove, a certified public accountant, to calculate the capacity fees that Fall Creek could reasonably charge its customers. Dove's calculation used the cost per customer, as calculated by Triad, and subtracted from that figure what he called the "debt portion," which represented the $4,700,000 provided by bonds toward financing the project. Dove also included in his calculations a table in 5% increments, from 45% to 75% of the 1986 per capita total charges. Dove provided the table to Fall Creek because the district had previously charged its customers $2,000 in connection charges, and he considered that his calculations reflected a significant increase over the previous fee; therefore, he provided the figures so that Fall Creek could choose an equitable figure in calculating its capacity fee. Fall Creek adopted the 45% figure calculated by Dove as the individual capacity fees for the three Basins.

The residential capacity fee is based upon the amount of capacity that must be set aside to serve the typical wastewater needs of a residential dwelling unit. In the event a nonresident seeks connection, the customer is charged a pro rata share of the cost that must be set aside to serve that customer.

On February 29, 1996, Fall Creek also adopted Ordinance 96–2 entitled "Ordinance Establishing Tap Fees." This ordinance re-quires owners of real estate within Fall Creek's jurisdiction to pay a $400 tap fee to connect to Fall Creek's sewage facilities system after February 29, 1996. Prior to enacting the ordinance, Fall Creek established a committee, which included Dove, to outline the various tasks and costs involved in "tapping" or connecting a new customer to Fall Creek's system. Fall Creek interviewed the employees responsible for each of the outlined tasks to determine the average amount of time spent on each task. Dove then multiplied the time spent on each task by the hourly rate of the employee responsible for that task to arrive at an average cost. By adding the average costs of each task involved in the tap process, Dove determined the total average costs of the tasks involved in the tap process.

On May 9, 1996, Taylor filed a verified complaint for injunction requesting that the trial court declare invalid Ordinance No. 96–2 establishing tap fees and Ordinance No. 96–3 establishing capacity fees. Thereafter, Taylor filed a motion for summary judgment. Fall Creek filed a response and a cross-motion for summary judgment on June 12, 1997. After a hearing on the motions, the trial court granted Fall Creek's motion for summary judgment. Taylor now appeals.

Two issues are raised for our review:

(1) whether Taylor, a developer within Fall Creek's service territory, has standing to challenge Fall Creek's connection charges; and

(2) whether the trial court erred in granting summary judgment in favor of Fall Creek after determining as a matter of law that Fall Creek had the authority to impose connection charges as set forth in Ordinance Nos. 96–2 (tap fees) and 96–3 (capacity fees) and that the fees were valid.

Initially, Fall Creek contends that Taylor lacks standing to challenge the ordinances. Taylor counters that the trial court erred in considering various deposition excerpts and the purchase agreement when determining the issue of standing. Specifically, he contends that the evidence of standing was never properly designated.

■ Parties should clearly and succinctly state factual issues and pertinent parts of the record that are directly relevant and a brief synopsis of why facts are material in their brief or memorandum opposing summary judgment motion. *Pierce v. Bank One–Franklin, NA,* 618 N.E.2d 16, 19 (Ind.Ct. App.1993), *trans. denied.* Fall Creek properly designated the various deposition excerpts and the purchase agreement in its cross-motion for summary judgment, thereby complying with Ind. Trial Rule 56(C).

Taylor further contends that the evidence was not properly published or filed with the trial court. Taylor relies upon case law overturned by the 1991 amendments to Ind. Trial Rule 5(D). *See Harvey's Indiana Practice,* Vol. 3, Rules of Procedure Annotated, Second Edition, p. 196, Author's Comments, § 56.14. The 1991 amendments eliminated the requirement of a separate publication. Publication is now achieved by simply filing the depositions with the trial court. *See Boss Manufacturing and Distributing, Inc. v. Steel Suppliers, Inc.,* 698 N.E.2d 1243, 1244, n. 1 (Ind.Ct.App.1998). Additionally, T.R. 56(C) only requires that Fall Creek designate to the court all parts of a deposition on which Fall Creek relies for purposes of its motion for summary judgment. Fall Creek designated specific excerpts and exhibits from Taylor's deposition and filed the evidence in his cross-motion for summary judgment.

■ The issue of standing focuses on whether the complaining party is the proper person to invoke the court's power. *Shand Min. v. Clay County Board of Commissioners,* 671 N.E.2d 477, 479 (Ind.Ct.App.1996), *trans. denied.* To have standing, a party must demonstrate a personal stake in the outcome of the law suit and be able to show that he was in immediate danger of sustaining some direct injury as a result of the conduct at issue. *Id.* " [M]ore fundamentally, standing is a restraint upon this Court's exercise of its jurisdiction in that we cannot proceed where there is no demonstrable injury to the complainant before us.' " *Hauer v. BRDD of Indiana, Inc.,* 654 N.E.2d 316, 318 (Ind.Ct.App.1995), *trans. denied,* (quoting, *City of Indianapolis v. Board of Tax Com-*

*missioners,* 261 Ind. 635, 638, 308 N.E.2d 868, 870 (1974)).

■ Relying on the excerpt from Taylor's deposition and a purchase agreement, Fall Creek contends that since Taylor as a developer transferred his interests in properties to his customers free and clear from all liens, he thereby transferred his right to challenge the ordinances. Further, Fall Creek contends that Taylor includes the connection fees in the price of the home and passes these charges to the customers. Fall Creek, however, takes Taylor's statements out of context and overlooks that fact that it is Taylor who has paid the connection fees directly to Fall Creek. It is ultimately Taylor who is responsible for payment. Further, it is logical to conclude that adding the fees to the price of his homes may affect his net profit. Additionally, the undisputed facts demonstrate that Taylor owns other developed real estate within Fall Creek's limits, which have yet to sell. Taylor has a direct and personal stake in the outcome of this lawsuit. Therefore, we conclude that he has standing to challenge the ordinance and to pursue this appeal from the trial court's entry of summary judgment.

■ In entering its order of summary judgment in favor of Fall Creek, the trial court set forth detailed findings and conclusions. Findings of fact and conclusions of law are not required but are sometime helpful in a summary judgment proceeding because summary judgment can be entered only when there is no genuine issue of material fact. *DPF, Inc. v. Vanderburgh County Board of Commissioners,* 622 N.E.2d 1332, 1334 (Ind.Ct.App.1993), *trans. denied.* Such findings and conclusions have no effect other than providing the appellant and this Court a statement of the reasons for the trial court's actions. *Id.*

■ When reviewing the grant or denial of summary judgment, this Court applies the same standard used by the trial court. *Ellerbusch v. Myers,* 683 N.E.2d 1352, 1354 (Ind.Ct.App.1997). Under T.R. 56(C), summary judgment is appropriate if the "designated evidentiary matter shows that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." When reviewing a cross-motion for summary judgment, the inquiry remains the same: whether a genuine issue of material fact exists which requires resolution by the court. *American Family Mutual Insurance Co. v. Dye*, 634 N.E.2d 844, 846 (Ind.Ct.App.1994), *trans. denied.* Where the parties do not dispute the facts material to the claim, our task on appeal is to determine whether the trial court correctly applied the law to the undisputed facts. *O'Neal v. Throop*, 596 N.E.2d 984, 986 (Ind. Ct.App.1992), *trans. denied.* "Summary judgment will be affirmed on appeal if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court." *Baker v. Osco Drug, Inc.*, 632 N.E.2d 794, 797 (Ind.Ct.App.1994), *trans. denied.*

■ Taylor argues that the trial court erred in entering summary judgment in favor of Fall Creek. Specifically, he contends that Ordinance Nos. 96–2 and 96–3 are invalid and that Fall Creek had no authority to enact the ordinances. Rules relating to statutory construction are to be applied in construing an ordinance. *Hobble By and Through Hobble v. Basham*, 575 N.E.2d 693, 699 (Ind.Ct.App.1991). Like statutes, ordinances are presumed to be valid, and the party challenging an ordinance bears the burden of proving invalidity. *Id.* at 696; *State ex rel. Blake v. Madison Circuit Court, Fiftieth Judicial Dist.*, 244 Ind. 612, 617–618, 193 N.E.2d 251, 254 (1963). The objective in statutory construction is to determine and give effect to the legislative intent. *Matter of Lawrance*, 579 N.E.2d 32, 38 (Ind.1991). We examine a statute as a whole, giving common and ordinary meaning to the words used. *Id.*

Pursuant to statute, Fall Creek has been granted broad discretion to enact ordinances establishing its rates and charges. Fall Creek is allowed to impose a flat charge for each connection and may consider any factor that "the board determines necessary to establish just and equitable rates and charges." IND. CODE § 13–26–11–2(1)–(7) (1998 Ed.). In addition to this authority, IND. CODE § 13–26–11–7 and IND. CODE § 13–26–11–4

provide for "connection charges" based on the cost of the facilities necessary to provide service to a connecting customer. Specifically, IND. CODE § 13–26–11–7 provides:

(a) If a district constructs sewers or water mains as a part of the construction of the works that are suitable for use as a local or lateral sewer or main by abutting or adjoining property, the district may charge for the connection on the basis of the pro rata cost of construction of a local or lateral sewer or water main sufficient to serve the property.

(b) Each property owner must agree to pay for the connection in making an application for service. If payment is not made as agreed, the payment constitutes a lien on the property for which the connection is made.

(c) The proceeds of the connection charges may be handled as:

(1) net revenues of the works; or

(2) payments toward the cost of construction or future improvements.

Section 4 provides that rates and charges for services do not have to be uniform throughout the district or for all users. In part, the statute provides:

The board may exercise reasonable discretion in:

(1) adopting different schedules of rates and charges; or

(2) making classifications in schedules or rates and charges:

(A) based upon variations in the costs of furnishing the services, including capital expenditures required, to various locations in the district; or

(B) where there are variations in the number of users in various locations in the district.

IND. CODE § 13–26–11–4.

Fall Creek has significant discretion in promulgating its rates and charges; however, IND. CODE § 13–26–11–9 requires that Fall Creek establish rates and charges which produce sufficient revenue to pay the necessary expenses of the district. *See also* IND. CODE § 13–26–11–8(a) (the board shall establish "just and equitable rates or charges"

which are payable by owner of each lot). IND. CODE § 13–26–11–8(b) grants Fall Creek the authority to change and readjust its rates.

■ The designated evidence shows that Fall Creek's tap and capacity fees are flat rate connection charges that are specifically authorized by IND. CODE § 13–26–11–2(1), which allows rates or charges to be determined based on a flat charge for each connection. Further, IND. CODE § 13–26–11–4 allows for "cost-based" connection charges.

■ Additionally, the designated evidence demonstrates that Fall Creek established a "just and equitable" cost-based connection charge. Fall Creek first contracted with Triad, a professional engineering firm, to determine the cost of constructing Fall Creek's system. Triad reviewed the original construction contracts for each of Fall Creek's three service Basins and its treatment plant. By calculating the total cost and dividing by the number of customers, Triad determined the cost of the facilities contributed to and used by Fall Creek's initial customer. Triad then prepared a report summarizing the cost per customer in each of Fall Creek's three Basins and submitted the report to the Board. Based on the findings in the report, Fall Creek enacted a capacity connection fee for each of the three Basins that was equal to 45% of the cost of the facility. Hence, Fall Creek's capacity fee was not based on "unknown future additions to the [Fall Creek's] sewage system." Rather, the capacity fee was intended to reflect "the cost of capacity in the District's treatment plant and transmission lines which must be permanently allocated to real estate producing wastewater and connecting to the District's system." *See* Ordinance No. 96–3. Vinton Dove, a certified public accountant, further calculated the actual costs of connecting each new customer to the system. Based on Dove's analysis, Fall Creek enacted Ordinance No. 96–2, establishing tap fees reflecting the average cost of physically connecting to the system.

■ Taylor further contends that Fall Creek's capacity fee violates IND. CODE §§ 13–26–5–2 and 13–26–11–8 in that the fee applies solely to individuals connecting to the system after the passage of the ordinance. The designated evidence demonstrates that all of Fall Creek's customers have been subject to some sort of connection charge and/or that money has been contributed equal to or in excess of the current capacity charge.

Since its inception, Fall Creek has had in place a connection charge payable by all new customers connecting to its system. Fall Creek also adjusted its connection charges in 1992 to include the cost of availability or capacity which must be reserved for each customer connecting to Fall Creek's system, pursuant to its authority to change its rates and charges under IND. CODE § 13–26–11–8(b). The designated evidence further reveals that the federal and state governments contributed significant money directly on behalf of Fall Creek's initial customers to remedy an environmental problem. Thomas M. Schubert, an engineer for Triad, testified that the government grants were made on behalf of the initial customers to Fall Creek, and he found it acceptable to utilize the grants funds in calculating the system's actual costs. Further, he stated that the money was not granted on behalf of the general public; rather, the money was specifically for the people residing within the Fall Creek Regional Waste District. Based on the designated evidence, the trial court properly concluded that Fall Creek's capacity and tap connection charges were not contrary to IND. CODE § 13–26 and did not discriminate against "new connections." Fall Creek's connection charges are neither arbitrary nor capricious.

Taylor's reliance on *Common Council of the City of Crown Point v. High Meadows, Inc.*, 173 Ind.App. 138, 362 N.E.2d 1166 (1977), is misplaced. In *High Meadows*, landowners brought suit challenging the City's ordinance which sought to increase fees charged for permits to connect to the City's sewer system. The trial court sustained the challenge. On appeal, this Court noted that municipal sewage connection charges are not necessarily limited to recoupment of the cost of the inspection and the actual work performed; however, the charges levied under the ordinance in ques-

tion exceeded the City's statutory authority. *Id.* at 139, 362 N.E.2d 1166, 1167. Specifically, this Court concluded that although the City may establish a connection rate or charge that includes amounts to be used for future improvements to the system, such charges may not be levied upon a selective basis implicit in establishing a taxable event such as a hookup to the system when there is an established group of users of the same system who will not be subject to the charges. *Id.* at 143, 362 N.E.2d 1166, 1169.

An important factor distinguishes *High Meadows* from the present case; here, Taylor is not being asked to pay for improvements to the system. Rather, under Ordinance 96-3, the capacity fee reflects the actual "cost of the capacity in [Fall Creek's] plant and transmission line which must be permanently allocated to real estate producing wastewater and connecting to [Fall Creek's] system." Hence, Taylor is not being subjected to charges on a selective basis. As previously mentioned, the initial users were subject to the same charges. The only difference is that the initial customers' charges were provided by state and federal grant monies paid directly on their behalf.

Additionally, the specific statutory provision at issue in *High Meadows*, IND. CODE § 19-2-5-20 (1971 Ed.) [now see IND. CODE § 36-9-23-25], lacks the discretion afforded to Fall Creek under IND. CODE § 13-26-11-2. Basing his argument on IND. CODE § 19-2-5-19 (1971 Ed.), Taylor contends that the City in *High Meadows* had the same statutory authority as Fall Creek. Taylor's argument is in direct conflict with the plain language of IND. CODE § 19-2-5-19, which applied to rates and charges levied during the construction of a municipal sewage facility. In *High Meadows* this Court specifically dismissed IND. CODE § 19-2-5-19 as irrelevant and stated:

> Ind.Code § ..., 19-2-5-19 [1971 Ed.] authorizes a flat charge for each sewer connection. However, the City concedes that it is inapplicable because it is limited to collecting 'for the services to be rendered after the contract for construction of the sewage works has been let and actual work

commenced in an amount sufficient to meet the interest on the revenue bonds and other expenses payable prior to the completion of the works.'

*Id.* at 141, 362 N.E.2d at 1168. The specific statutory provision at issue in *High Meadows* was IND. CODE § 19-2-5-20, which is void of any reference to the type of discretion which is granted to Fall Creek under IND. CODE § 13-26-11-2(7).

■ Taylor also alleges that the methodology used by Fall Creek in establishing its capacity fee connection charge was arbitrary. IND. CODE § 13-26-11-4 and IND. CODE § 13-26-11-7 encompass the use of connection charges based on the cost of the facilities necessary to provide service to a connecting customer. Further, IND. CODE § 13-26-11-2(7) grants Fall Creek the authority to provide service to a connecting customer. The designated evidence shows that Fall Creek based its charges on Triad's cost study, which used a historical cost basis. Such methodology is appropriate in calculating costs. *See* IND. CODE § 13-26-11-2; *see also Loomis v. Hailey*, 119 Idaho 434, 807 P.2d 1272 (1991) (city was not required to use historical cost as a basis to determine the connection fee); *Prisk v. City of Poulsbo*, 46 Wash.App. 793, 732 P.2d 1013 (1987), *review denied*, (utility connection fees imposed against developer based on a rate schedule which considered uses of utility system by "old customers" and "new customers" by exempting "old customers" who paid the most over time for system from paying a connection fee while charging "new customers" for historical cost of utility system as it currently existed, satisfied a tax uniformity requirement of Washington Constitution). IND. CODE § 13-26-11-2 does not require Fall Creek to use a particular or specific methodology over any other methodology in determining the cost of its system or the amount of its charges. This Court concludes that Fall Creek has discretion to charge a percentage of the actual cost of the facilities necessary to provide service to a connecting customer to avoid significant increases in cost to the new customers—otherwise termed "rate shock." Further, for Fall Creek to include the $4,700,000 in bond reve-

nue would be to include costs which have not yet been paid.

Next, Taylor contends that Fall Creek's capacity fee connection charge is arbitrary and capricious, in that Fall Creek cannot measure capacity within its system and does not actually assign capacity to customers. Fall Creek, however, designated evidence explaining Fall Creek's ability to measure the actual and theoretical capacity within the system. Contrary to Taylor's unsupported assertion, Schubert stated that as new customers connected to Fall Creek's system, Fall Creek set aside sufficient capacity to ensure that the connecting customers would receive safe, efficient, and adequate wastewater collection and treatment services.

Taylor also challenges the methodology used by Fall Creek in arriving at a just and equitable "tap" charge. As previously explained, the tap fee calculations considered the various tasks involved and the *average* cost of connecting a new user to Fall Creek's system. Fall Creek's connection charges were neither arbitrary nor capricious, and were entirely consistent with Fall Creek's authority under IND. CODE § 13–26 *et seq.* Accordingly, the trial court's entry of summary judgment in favor of Fall Creek is affirmed.

Affirmed.

SHARPNACK and SULLIVAN, JJ., concur.