ROGER GEIMER *v*. CENTER UTILITIES, INC. AND HIDDEN LAKES, INC.

[No. 1071A196. Filed May 3, 1972.]

*Lowell E. Enslen, William J. Moran, Peters, McHie, Enslen & Moran,* of Hammond, for appellants.

*Allen F. Wharry,* of Lebanon, *Donald L. Jackson, Bingham, Summers, Welsh & Spilman, John J. Metts,* Assistant Public Counselor, of Indianapolis, for Appellees.

WHITE, P.J.—Appellee Center Utilities, Inc. (Utilities) is a duly franchised rural sewage disposal utility serving some 200 homes in an area of Center Township of Lake County

southwest of the Town of Crown Point.[1] In 1965, when Utilities was then serving 163 homes, all its capital stock was acquired by Mr. and Mrs. William F. Brunt who now[2] manage and operate it. Mr. Brunt, the President, also owns and operates the Brunt Plumbing and Heating Company, which does the maintenance and repair work on the physical facilities of Utilities under his management and direction. Mrs. Brunt as Secretary of Utilities does the paper work except for the accounting which is handled by an independent public accountant.

It appears that from the time Utilities commenced operation its rate schedule has been $4.50 per dwelling per month for service, with a tap-on fee of $100.00. On April 2, 1971, the Commission held a hearing on Utilities' petition to raise its charge for service to $7.00 per month and its tap-on fee to $850.00. At that hearing appellee Hidden Lakes, Inc., owner of all the undeveloped lots in Hidden Lakes subdivision, appeared by counsel (pursuant to a petition to intervene) and opposed the requested increase of the tap-on fee.

None of the patrons who are now appellants appeared at that first hearing either in person or by attorney. At the conclusion of the testimony given by Mr. Brunt, President of Utilities, (the only witness called in support of the petition) the attorney representing Utilities requested a continuance for the purpose of amending the petition "in light of the evidence". The continuance was granted and the case was reset for May 7, 1971.

Prior to the May 7th hearing Utilities filed an amended petition requesting that the monthly service charge be in-

---

1. A certificate of territorial authority was issued to Utilities pursuant to § 97C of the Public Utility Act of 1913, as added by Ind. Acts 1957, Ch. 313 § 2 (now IC 1971, 8-1-2-89) being also Ind. Ann. Stat. § 54-601c (Burns 1971 Supp.) by the Public Service Commission of Indiana on August 3, 1961. When and by whom the physical plant was constructed, when it commenced operation, how many homes it served initially and who owned and managed the corporation prior to the present ownership are not disclosed by the record.

2. "Now" is May 21, 1971, the date of Public Service Commission's final hearing.

creased to $10.50 (instead of $7.00). The originally requested tap-on increase to $850.00 was scaled down to $600.00.

On May 7, 1971, Utilities and Hidden Lakes again appeared. Also at that time the appellants, the protesting residential users (Protestants), appeared for the first time.[3] Their attorney, who later stated that they had not opposed the original petition because they considered the requested $7.00 service fee reasonable, moved for a continuance. The matter was continued to May 21, 1971, at which time further evidence was received and the hearing was concluded.

On September 10, 1971, the Commission issued its order granting the increases requested in the amended petition.

The Protestants have appealed, making the statutory assignment of error that the Commission's decision is contrary to law.[4] In their brief, after asserting that the facts found by the Commission are insufficient to sustain its order and that the evidence is insufficient to sustain the Commission's finding of facts, Protestants make no attempt to point out with any degree of specificity wherein either the findings or the evidence is insufficient. Instead their short argument alludes very generally to the evidence most favorable to their attempt to show: 1) that because the service being rendered is not reasonably adequate, Utilities is not entitled to any rate increase, and 2) that the monthly rate of $10.50 is higher than is fair and reasonable.

---

3. At all hearings the Public Counselor appeared by his assistant but took little part in the proceedings. He has not participated in this appeal.

4. Pursuant to Ind. Const. Art. 7, § 6, the Supreme Court of Indiana has conferred jurisdiction on the Court of Appeals "to review final decisions of the Full Industrial Board of Indiana, the Review Board of the Employment Security Division, and the Public Service Commission of Indiana . . . as provided by statute for the Appellate Court. . . ." Indiana Rules of Procedure, AP 4(C). The Public Service Commission "appeal" statute is IC 1971, 8-1-3-1 (Ind. Acts 1957, Ch. 189, § 1, Ind. Ann. Stat. § 54-443), which provides, inter alia:

"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered."

The pertinent findings of fact made by the Commission are:

". . . 3. That the original cost of Petitioner's sewage plant used and useful in service to the public as of September 30, 1970, is $28,469.98 and, with a related depreciation reserve of $17,819.04, results in net plant of $10,650.94; and that on the same date contributions in aid of construction and unamortized system connections applicable to the sewage plant were not booked.

"4. That, for the year ended September 30, 1970, at present rates, Petitioner had a net operating loss in the amount of ($12,337.47) ; that such amount does not provide a fair rate of return on Petitioner's plant used and useful in providing sewage disposal service to Petitioner's customers; and that therefore the existing rates are unjust, unreasonable and confiscatory.

"5. That the evidence presented in this cause by Protestants shows an extremely poor maintenance program; that the various witnesses who testified in opposition to the rate increase relate common problems among the various customers of Petitioner, which problems encompassed raw sewage entering their residences through basement floor drains, of water flooding into their basements after hard rains, and terrible odors throughout the area served by Petitioner; that raw sewage flowing into Hermit's Lake was polluting that body of water to the extent that the lake was near the point of being closed for swimming; that these problems, inter alia, have existed within the sewage system for several years.

"6. That the evidence revealed that the various manholes within the sewage system need to be shoveled out and channeled to help the flow of liquids; that year-round chlorination of the system is needed; that the septic condition existing within the terminal lagoons needs to be corrected; that a new aeration vessel and settling tank is needed and that the infiltration of the sewage lines by rain water must be prevented.

"7. That Petitioner immediately should institute a program of maintenance, repair and modernization of the system which is calculated to upgrade the system to a high degree of efficiency and service and which will enable Petitioner to regain and hold the good will of its patrons.

"8. That the Indiana State Board of Health sent a Sanitary Engineer on an official visit to examine Petitioner's sewage system, that such examination was made; that the engineer testified generally as to the poor operating condi-

tion of the plant and the appurtenances thereto; that the exact nature of the repairs and corrections to the system recommended by the Indiana State Board of Health is contained in a letter of recommendation from that agency to Petitioner.

"9. That, immediately upon receipt of the Order of this Commission in this cause, Petitioner is instructed to notify the Engineering Department of this Commission in order that certain measures and procedures be taken to insure rigid compliance with such recommendations insofar as possible; that Petitioner is to certify to the Engineering Department of this Commission the improvements made in compliance with such letter of recommendations as the improvements are made.

"10. That the evidence revealed that Petitioner is unable to make the needed repairs and improvements to the sewage utility system without increased rates and charges; that Public's Exhibit No. 1 showed a net operating loss of ($12,337.47) ; that Petitioner must have an increase in its rates and charges in order to commence any repair and improvement program.

"11. That Petitioner has proposed a new schedule of rates for its sewage utility service, said rates being set out in Appendix A, attached hereto and made a part hereof. Using a test year ended September 30, 1970, and taking into account adjustments made by Petitioner and giving effect to the proposed rates, Petitioner's *pro forma* operating revenues would be $27,887.46 and, with operating expenses of $27,008.27, would result in a net operating income of $879.19.

"12. That the net operating income produced by the proposed rates is not in excess of a fair return on Petitioner's property and said rates are fair and reasonable and should be approved; and it will be so ordered."

Protestants make no specific reference to (and apparently accept as correct) the Commission's finding No. 3, which amounts to a finding that the value of Utilities' physical facilities for rate-making purposes is $10,650.94.[5] Nor do they directly attack finding No. 11's forecast of a net operating

5. Accounting exhibits in the record indicate that "net plant" is utility accounting argot for "plant value" (probably more accurately "book value of the plant" since it appears to be arrived at by subtracting "depreciation" from initial cost).

income of $879.19 at the $10.50 service rate and the $600.00 tap-on fee. This amounts to a ratio of net income to "net plant" of 8.25%.

Protestants make an oblique attack on the Commission's findings 11 ("net operating income") and 12 ("fair return"), by, (1) pointing to evidence that two other rural sewage disposal utilities in the general area render adequate service and make a "fair return" at monthly service rates of $4.00 and $5.95 and, (2) asserting that a compilation of figures prepared by their utility accountant is "the most telling evidence offered in opposition" to the petition for the $10.50 rate. In that chart their accountant "forecast" the rate of return (in terms of "ratio" or percentage of net income to net plant value) for eight possible monthly rates ranging from $4.50 to $10.50, plus an estimated 5 tap-on fees of $600.00 each. In each instance he predicted a profit ratio ranging from 3.42% to 12.12%. He showed a probable profit of 7.04% on a $7.00 rate.[6]

Protestants' argument wholly ignores all evidence which conflicts with the evidence most favorable to their contentions. Evidence thus ignored includes the testimony of Mr. Brunt and his accountant, and the compilation prepared by the Commission's accounting department and introduced into evidence by the Public Counselor. The Commission's findings follow its accounting department's projection except that the Commission reduces the accounting department's anticipated revenue figure by $500.00. This reduction is supported by evidence indicating that the total number of paying patrons

6.  A letter to Protestants' attorney which accompanied the accountant's forecast shows that the operating expense figures he used came from a Mr. Fabian, Protestants' expert witness-engineer. Except for the depreciation figure which is correct, the remaining expenses are less than one-third of the amount of actual expenses for the year ending September 30, 1970, as shown by exhibits prepared by Utilities' accountant and less than one-fourth of the estimated expenses for the ensuing year. This wide disparity in the expense item is not fully reflected in comparisons of his projected ratios with those yielded on the Commission's findings for the reason that Protestants' accountant used a net plant figure of $128,993.00 taken from Utilities' petition. That figure appears to be in error by some $118,342.06.

will be less than the 200 estimated by the accounting department. Other figures used by the accounting department, particularly the items of operating expenses totaling $27,008.27, are fully sustained by petitioner's evidence.

The finding that the $10.50 rate will probably produce a net operating profit of $879.19 (amounting to a 8.25% rate of return) and that such "is not in excess of a fair return on Petitioner's property" rests on substantial evidence. We, therefore, cannot disturb it. *Boone County Rural Electric Membership Corporation* v. *Public Service Commission of Indiana* (1959), 239 Ind. 525, 532, 159 N. E. 2d 121.

In ascertaining whether the Commission was also justified in finding those rates to be "fair and reasonable" (No. 12), we consider appellant-protestants' contentions that, (1) the increase is an attempt to recover prior losses and that, (2) the service is so inadequate that no increase is justified.

Assuming *arguendo* that Petitioner (Utilities) requests have been motivated by a desire to recoup losses incurred in prior years, the findings of the Commission nevertheless disclose a quite different reason for granting the increase. Finding No. 10 is "that Petitioner is unable to make the needed repairs and improvements . . . without increased rates . . . [and] must have an increase . . . in order to commence any repair and improvement program." The Commission quite obviously believed that any lower rate of return would be insufficient to induce investment of the additional capital required for the "program of repair, improvement and modernization" which it ordered.[7] Which is to say, in effect, that if a profit ratio of 8.25% is achieved it is, in light of today's investment market, not high enough to provide an excess for liquidation of prior losses. Once again, appellants' contention has merit only in relation to the evidence most favorable to

---

7. The Commission's findings which have been quoted herein are all implemented by formal orders which we consider unnecessary to quote.

appellants and ignores the conflicting evidence on which the Commission's findings are based.

We interpret the Commission's findings 5, 6, 7, 8 and 9 as substantially a finding in favor of remonstrators on the issue of the adequacy of service and facilities. The Commission has not, however, adopted remonstrators' contention to the effect that Utilities has forfeited its right to a reasonable return on its investment because its service and facilities are not "reasonably adequate." On the contrary, the purport of its finding No. 11 is that an increase in rates is essential to any improvement in the service.

The relationship of the adequacy of a utility's facilities and service to the fairness of its rates is a matter which seems to have received little, if any, attention from Indiana courts.[8] That there is a relationship is clearly implied, however, in our statutory and case law. Ind. Ann. Stat. § 54-201 (Burns 1951), IC 1971, 8-1-2-4, provides:

> "Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any publc utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just and every unjust or unreasonable charge for such service is prohibited and declared unlawful . . . ."

Ind. Ann. Stat. § 54-601c (i) (Burns 1971 Supp.), IC 1971, 8-1-2-89 (i) provides:

> "A sewage disposal company shall be required to furnish reasonable adequate sewage disposal services and facilities for which said service and facilities it shall be entitled to charge reasonable, nondiscriminatory rates, subject to the jurisdiction of the commission for the purpose of fixing said rates to be charged to patrons of such sewage disposal company for sewage disposal service, and for such purpose the commission is given jurisdiction to proceed in

8. We are not directly or immediately concerned here with the only express remedy provided by statute for failure to render adequate sewage disposal service, which is revocation of the certificate of territorial authority. Ind. Ann. Stat. § 54-601c (i), IC 1971, 8-1-2-89 (i). No request for revocation was made and no notice was given that Utilities' franchise was in jeopardy at the hearing.

the same manner and with like power as is provided by this act in the case of public utilities."

In *Public Service Commission of Indiana* v. *City of Indianapolis* (1956), 235 Ind. 70, 96, 131 N. E. 2d 308, 318, we find this general statement (made in a case *not* involving alleged inadequacy of service or facilities) :

> "The rate making process involves . . . a balancing of the owner's or investor's interest with the consumer's interest. On the one side, the rates may not be so low as to confiscate the investor's interest or property; on the other side the rates may not be so high as to injure the consumer by charging an exorbitant price for service and at the same time giving the utilty owner an unreasonable or excessive profit."

One need not be learned in any of the social sciences concerned with the philosophy of utility rate regulation to realize that the utility patron's (consumer's) interest extends beyond avoidance of overcharge. To be charged more for inferior service than good service should cost (injurious and infuriating as it is) is a lesser injury than to be denied any service whatsoever. Not the least difficult of the Commission's problems, then, in balancing interests in the exercise of its rate regulatory power is the question of when, and to what extent, the interest of the patrons in low rates should be subordinated to their interest in continued service. The problem is exacerbated when, as here, the service and facilities have deteriorated well below the statutory "reasonably adequate" standard, yet the utility is found to be "unable to make the needed repairs and improvements . . . without increased rates and charges."[9]

Faced with this dilemma the regulatory bodies of other jurisdictions have reached a variety of solutions,[10] some upheld

9. Commission's finding No. 10, *ante*, p. 68.

10. See: Nichols, RULING PRINCIPLES OF UTILITY REGULATION—Rate of Return, 396 *et seq.*; Nichols and Welch, RULING PRINCIPLES of UTILITY REGULATION—Rate of Return, Supplement A (1964), 307 *et seq.*

in the courts,[11] others struck down.[12] In *Township Committee of Lakewood Township* v. *Lakewood Water Co.* (1959), 54 N. J. Super. 371, 148 A. 2d 885, the Appellate Division of the New Jersey Superior Court said (citations omitted):

"The sole ground of appeal is that the increase in sewer rates was unjustified because the company had not been rendering adequate and proper sewage service. [148 A. 2d at 887.]

\* \* \*

"The township's argument proceeds from the legislative mandate set out in R.S. 48:3-3, N. J. S. A., that 'No public utility shall provide or maintain any service that is unsafe, improper or inadequate, \* \* \*.' This duty to provide safe, proper and adequate service is an element which the Board must take into consideration in determining what is a just and reasonable rate of return. . . . The relations between adequate, efficient service and a fair return are mutual and interdependent. In no event should the rate granted a utility 'be more than the reasonable worth of the service supplied.' . . . The burden of proof of showing that the proposed rate increase is just and reasonable is upon the utility company. [148 A. 2d at 889.]

\* \* \*

"We recognize, of course, that the Board has a large measure of legislative discretion in the exercise of its rate-making power, controlled by the statutory standard. . . . It is free to make 'pragmatic adjustments which may be called for by particular circumstances.' . . . Thus, it may under the facts adduced before it in a particular rate case conclude that the issue of adequacy of service is collateral and would so complicate the rate case that it should be taken care of upon complaint in a separate proceeding. . . . On the other hand, the Board would be privileged, in a case where the utility had failed over a long period to provide safe, proper and adequate service and had flagrantly disregarded orders of the Board to improve that service, to refuse any rate increase as the most practical method of getting the utility to remedy the deficiency. . . . Again, the Board might

11. *Market Street Railway Co.* v. *Railroad Commission of California* (1945), 324 U.S. 548, 562.

12. *Elyria Telephone Co.* v. *Ohio Public Utilities Commission* (1953), 158 Ohio St. 441, 98 P. U. R. (n.s.) 246, 110 N. E. 2d 59; *General Telephone Co.* v. *Michigan Public Service Commission* (1954), 341 Mich. 620, 8 P. U. R. 3d 97, 67 N. W. 2d 882.

conclude that the inadequate service rendered was due to the company's need for additional revenues for capital expenditures, and determine that the withholding of rate relief might cause further deterioration in service. . . . 'A starved utility is in no better position to render proper service than a starved horse or a motor car without fuel.'

"In yet another case of demonstrated inadequate service, where the utility promised to make necessary improvements, the Board might deny the application, granting leave to renew after it had had an opportunity to see if the improvements were carried out and the service made adequate and proper, . . . or, where the utility admitted that the service could be improved but claimed financial inability to do so, the Board might allow only such rates as would represent the present value of the service, until such time as the service was made reasonably adequate. . . . Finally, it might grant emergency rate increases on the condition that if the utility failed to render reasonable service the rates would be cancelled." [148 A. 2d at 890-1.]

It would appear from the foregoing that the New Jersey Board of Public Utility Commissions is possessed of broad discretion in the choice of the means it will employ to deal with a rate increase petitioning utility which has failed to render satisfactory service but is otherwise entitled to an increase. If we were to assume that the Public Service Commission of Indiana also possessed that same "large measure of legislative discretion in the exercise of its rate-making power,"[13] we could not say that it had abused its discretion in this case if it had "conclude[d] that the inadequate service rendered was due to the company's need for additional revenues for capital expenditures, and [had] determine[d] that the withholding of rate relief might cause further deterioration in service." And, although it used other words we believe that is precisely the meaning of the Commission's finding No. 10 which concludes, "that Petitioner must have an increase in its rates and charges in order to commence any repair and improvement program."

13. We do not intend to imply that it does or does not possess that measure of discretion.

Nothing we may say (and nothing we can *legally* order) will mean much to homeowners who are being forced to pay twice as much for poor service as patrons of other nearby sewage utilities are paying for good service. Whatever may be the cause of that unfortunate and unfair situation one cannot lay the blame at the rate payers' door.[14] We do believe, however, that the Commission has written a prescription which can cure the ills which now inflict pain on both operator and patrons. The increase in the monthly service charge is an essential ingredient and the one medicine the patient is certain to take. Vigilance on the part of the Commission's staff, the Board of Health staff, and the Protestants themselves is the only assurance that the other therapeutic agents prescribed will be timely, consistently, and adequately employed. If the Commission's orders are carried out the time may be not too distant when the patrons of Utilities will be paying service charges and receiving services comparable to those of their neighbors. If not, the only remedy left may be revocation of Utilities' franchise. That may be more punitive than curative.

The order of the Public Service Commission of Indiana is affirmed.

Buchanan and Sullivan, JJ., concur.

NOTE.—Reported in 281 N. E. 2d 819.

---

14. Testimony that cement blocks, crutches, bicycles, etc., had to be removed from sewer lines indicates some contribution to maintenance costs by thoughtless persons with access to sewer openings, but gives rise to no reasonable inferences that homeowners themselves are at fault. Nor is it suggested that these abuses are more frequent in this area than in those areas where rates are so much lower.