FARLEY NEIGHBORHOOD ASSOCIA-TION, The Laundry Connection of Indiana, Inc. and William and Amy Tischer, Appellants–Petitioners,

v.

TOWN OF SPEEDWAY, Appellee–Respondent.

No. 49A04–0008–CV–328.

Court of Appeals of Indiana.

April 23, 2001.

Bette J. Dodd, Todd A. Richardson, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellants.

Anne E. Becker, Robert M. Glennon, Daniel M. Levay, Indiana Office of Utility Consumer Counselor, Indianapolis, IN, Amicus Curiae.

James M. Gutting, Nicholas K. Kile, Barnes & Thornburg Indianapolis, IN, Attorneys for Appellee.

L. Parvin Price, J. Christopher Janak, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Amicus Curiae: Indiana Association of Cities and Towns, Indiana Municipal Lawyers Association.

## OPINION

ROBB, Judge.

The Farley Neighborhood Association, the Laundry Connection of Indiana, Inc., and William and Amy Tischer (collectively the "Petitioners") appeal the trial court's order upholding that portion of Ordinance No. 924 adopted by the Town of Speedway ("Speedway") which continued the imposition of a fifty percent (50%) surcharge to customers of the municipality's sewer system who live outside Speedway's corporate boundaries. We reverse.

### *Issue* [1]

The Petitioners raise the following consolidated and restated issue for our review:

---

1. Petitioners also raise the following issues for our review: (1) whether the trial court's interpretation of Indiana Code section 36–9–23 *et seq.* renders the statute unconstitutional; and (2) whether the trial court's requirement that Petitioners post a bond is unconstitution-

al. Because we have determined that the fifty percent (50%) surcharge violates Indiana Code section 36–9–23–25 and Indiana Code section 36–1–3–8(6) and have reversed the trial court's order with regards to the portion which affirms the provision of Ordinance No.

whether Speedway abused its discretion in adopting a rate classification which charged the out-of-town customers of the municipality's sewer system fifty percent (50%) more than customers living within Speedway's corporate boundaries.

### Facts and Procedural History

Speedway is a municipality that owns and operates a wastewater collection and treatment system that is not subject to Indiana Utility Regulatory Commission authority. See Ind.Code § 36–9–23–1 et seq. Speedway's rates and charges for sewage disposal are set by its legislative body, the town council. Ind.Code § 36–9–23–25. Individuals living outside the corporate boundaries of Speedway are not allowed to vote in town elections, including those for town council. Petitioners utilize Speedway's sewer system but reside outside the corporate boundaries of the municipality. The only service the petitioners receive from Speedway is sewage disposal; other services such as fire and police protection, storm water drainage, and schools are provided by other governmental entities.

In 1950, several developers who owned property outside Speedway's corporate boundaries approached the municipality about providing sewer system services to their pending residential developments. Speedway agreed to extend its sewer system provided that the developers agreed to pay a higher rate or surcharge for the service than the in-town residents in order to cover the costs associated with the extension of the service. Instead of con- tracting with another sewer system provider, starting their own utility, or utilizing an alternative method of sewage treatment, the developers agreed to pay the surcharge in order to utilize Speedway's sewer system.

Thereafter, Speedway began planning the construction of a new water treatment plant and the infrastructure needed to extend Speedway's sewer system outside its corporate boundaries. On April 27, 1954, Speedway approved and adopted Ordinance No. 143 which required the sewer customers living outside the municipality's corporate boundaries to pay rates which were twenty percent (20%) higher than the in-town customers of the sewer system. After the new treatment plant and infrastructure were constructed but before the out-of-town residents were connected to Speedway's sewer system, Speedway approved and adopted Ordinance No. 198 which increased the surcharge to be levied upon the out-of-town customers of the sewer system to fifty percent (50%). Subsequently, the out-of-town residents were connected to Speedway's sewage system. The rate classification between the in-town and out-of-town customers of the sewer system remained in effect and unchallenged for more than forty-five years.

On April 10, 2000, Speedway introduced Ordinance No. 924 which raised the user fees 38.35% across the board for its sewer system customers.[2] Ordinance No. 924 also continued the fifty percent (50%) surcharge levied upon out-of-town customers of Speedway's sewer system.[3] Thereafter,

924 that levies the imposition of the surcharge, we need not address these issues.

2. It is apparent that Speedway increased user fees in part to fund the Lynhurst Drive Sewer Separation project. The overall intent of the project is to eliminate a combined sewer overflow point in the collection system that allows untreated water to discharge into Eagle Creek. R. 854. The separation of the combined sewers would free up capacity in the collection system to handle inflow and infiltration from out of town. R. 855.

3. The record reveals that there are 3,356 residential and 719 commercial/industrial ratepayers of sewage disposal within Speedway's corporate boundaries. There exists 2,241 res-

Speedway published notice in the local paper and mailed notice to all of the customers of the sewer system that a public hearing would be held on April 24, 2000, regarding the adoption of the new sewage rates and charges. At the public hearing, several customers of Speedway's sewage system who lived outside the municipality's corporate boundaries voiced their opposition to Ordinance No. 294. Specifically, the out-of-town customers objected to that portion of the ordinance that continued the imposition of the fifty-percent (50%) surcharge upon the out-of-town customers. In the objectors' view, this surcharge was creating a growing disparity between the charges levied against the in-town and out-of-town customers of Speedway's sewer system.[4] Thereafter, Speedway adopted Ordinance No. 924 as the legislation was originally introduced by the town council to the general public.

On April 28, 2000, Petitioners filed with the clerk-treasurer of Speedway a petition opposing Ordinance No. 294 pursuant to Indiana Code section 36–9–23–26.1. On May 1, 2000, the clerk-treasurer filed the petition with the trial court. The petition provides in pertinent part that:

> This petition opposes the increase in actual sewer service cost disparity for services rendered by the sewage works to customers located "inside" the limits of [Speedway] as compared to customers located "outside" the limits of [Speed-

way] serviced by the sewage works. There is no justification for the disparity.

R. 7–8.

On May 9, 2000, Speedway requested that the trial court order Petitioners to post a bond in the amount of $200,000.00 before proceeding on the petition. Following a hearing, the trial court ordered the Petitioners to post a bond in the amount of $75,000.00. On June 1, 2000, the Petitioners posted the bond with the trial court. Thereafter, a bench trial commenced in the Marion County Superior Court on the petition. On July 20, 2000, the trial court entered findings of fact and conclusions of law affirming Speedway's adoption of Ordinance No. 924. This appeal ensued.

### Discussion and Decision

The Petitioners contend that Speedway abused its discretion in imposing a surcharge of fifty percent (50%) to out-of-town customers of its sewage disposal system because the municipality failed to provide sufficient evidence to justify the differential between in-town and out-of-town customers of the sewer system. We agree.

### I. Standard of Review

Here, the trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule Rule 52(A).[5] Therefore, in reviewing the exer-

---

idential and 85 commercial/industrial rate-payers residing outside Speedway's corporate boundaries. R. 299.

4. For example, evidence presented at trial established that the Laundry Connection of Indiana, Inc., which is located outside Speedway corporate boundaries, was paying almost $609.00 a month or $7,200.00 a year more than a competitor who operated Laundromats located just a mile away but within the municipality's corporate boundaries. R. 261.

5. We note that both parties submitted proposed findings of fact and conclusions of law to the trial court. The trial court adopted nearly verbatim Speedway's findings of fact and conclusions of law in its July 20, 2000 order. When a trial judge signs a party's proposed findings of fact and conclusions of law, they become the trial court's findings of fact and conclusions of law. *National Briquette Corp. v. State Bd. of Tax Comm'rs*, 604 N.E.2d 11, 13 (Ind.Ct.App.1992), *trans. denied.* The trial court is responsible for the correctness of the findings of fact and conclu-

cise of the court's discretion, we must apply a two-tiered standard of review. We decide whether the "evidence supports the findings and the findings support the judgment." *Chidester v. City of Hobart,* 631 N.E.2d 908, 910 (Ind.1994). We construe the findings liberally in support of the judgment. *OVRS Acquisition Corp. v. Community Health Servs., Inc.,* 657 N.E.2d 117, 124 (Ind.Ct.App.1995), *trans. denied.* The findings are erroneous only when a review of the record indicates to the court that a mistake has been made. *Id.* When a judgment is not supported by the findings of fact and the conclusions, it is clearly erroneous. *DeHaan v. DeHaan,* 572 N.E.2d 1315, 1320 (Ind.Ct.App.1991), *trans. denied.* The court must consider only the evidence favorable to the judgment and must draw all reasonable inferences therefrom. *Id.*

 Furthermore, the Petitioners are appealing from a negative judgment of the trial court. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion opposite that reached by the trial court. *J.W. v. Hendricks County Office of Family and Children,* 697 N.E.2d 480, 481 (Ind. Ct.App.1998). We will reverse a negative judgment on appeal only if the decision of the trial court is contrary to law. *Id.* at 482. In determining whether a negative judgment is contrary to law, we neither reweigh evidence nor judge the credibility of witnesses, and consider only the evidence most favorable to the prevailing party, together with all reasonable inferences flowing therefrom. *Id.*

## II. Extension of Sewage Disposal Outside Corporate Boundaries

 We note initially that municipalities in Indiana have the power to control the disposal of sewage, and a municipality's operation of a sewer system is an exercise of its police powers. Indiana Code section 36–9–2–16 vests such power with municipalities:

> A unit may regulate the furnishings of the service of collecting, processing, and disposing of waste substances and domestic or sanitary sewage. This includes the power to fix the price to be charged for that service.[6]

Indiana Code 36–9–2–17 defines the power to control the disposal of sewage:

> A unit may collect, process, and dispose of waste substances and domestic or sanitary sewage, and may establish, maintain, and operate sewers, sewage disposal systems, and systems to collect and dispose of waste substances.

Because the ownership of sewers generally rests with a municipality, property owners have no right to make connections with or use a municipality's sewer system without the consent of the municipality. In addition, when municipalities exercise their power to control the disposal of sewage, such power typically may be exercised only within the confines of the municipalities' corporate boundaries.[7] However, munici-

---

sions of law and they are not weakened because they were adopted verbatim. *Id.* If the proposed findings of fact and conclusions of law did not state the facts as the trial court found them to be, it would not have adopted them as its own. *Id.* Indiana Trial Rule 52(C) encourages the trial court to request the parties to submit proposed findings of fact and conclusions of law. Thus, trial courts have the discretion to adopt a party's proposed findings of fact and conclusions of law as their own.

**6.** A municipality may also charge a fee for connections to the sewer based on the pro rata cost of constructing a local or lateral sewer sufficient to serve the property. *See* Ind.Code § 36–9–23–29.

**7.** We note that Indiana Code section 36–9–2–18 allows a municipality to exercise its power

palities may enter into contracts extending their jurisdiction to regulate sewage disposal. Indiana Code section 36-9-23-6 provides that:

> The board may enter into all contracts or agreements necessary or incidental to the performance of its duties and the execution of its powers under this chapter.

In the present case, several developers of land outside Speedway's corporate boundaries approached the municipality in 1950 about the possibility of connecting to its sewer system. On February 27, 1950, Speedway enacted Ordinance No. 143 which allowed the out-of-town residents to connect to the municipality's sewer system provided that the residents agreed in writing to: (1) pay a $200.00 connection fee; (2) pay user fees which contained a twenty percent (20%) surcharge above that paid by in-town residents;[8] and (3) grant the municipality sufficient interest to create a perpetual easement for the sewer lines. R. 398-99.

On February 15, 1954, Speedway enacted Ordinance No. 198 which provides in pertinent part that:

> WHEREAS, [Speedway] has heretofore constructed and has in operation a sewer system for the purpose of collecting sewage and conveying the same away from the premises where produced; and
>
> WHEREAS, [Speedway] has heretofore authorized the construction, maintenance and operation of works for the treatment and disposal of sewage ...; and
>
> WHEREAS, the costs of such works and the amount of revenue bonds to finance the same has been determined, and tentative contracts for the construction of said works have been awarded, subject to sale of the said revenue bonds; and
>
> WHEREAS, [Indiana statute] authorizes the collection of rates and charges where the construction of such works has been commenced; now therefore,
>
> BE IT ORDAINED by the Board of Trustees of [Speedway]:
>
> * * *
>
> The rates and charges fixed herein shall apply to lots, parcels of real estate and/or buildings located within the limits of [Speedway]. For service rendered by said sewage treatment works to lots, parcels of real estate or buildings located outside the limits of [Speedway], the rates and charges, including minimum charge, shall be one hundred fifty per cent (150%) of those rates and charges established herein, and all other provisions herein set out shall be applicable to such users located outside the city limits.
>
> * * *
>
> These rates and charges shall be extended to cover any additional premises thereafter served, without the necessity of any hearing or notice.

R. 402, 408.

The record contains evidence that Speedway contractually agreed with several developers to provide sewage disposal to certain property located outside the municipality's corporate boundaries. The record contains several of these agreements, the oldest of which contained in the record is one entered into by Emmanuel and Alta

---

to control disposal of sewage up to four (4) miles outside its corporate boundaries.

8. The applicants had to also agree in writing that the user fees would "be an obligation which runs with and is a burden upon the land described and shall run in favor of [Speedway's] easement rights in the sewer." R. 399.

Farley and Speedway on May 25, 1955. This agreement provides in pertinent part that:

> In order to provide sanitary sewers for certain properties located outside the corporate limits of [Speedway], the Farleys agree to construct a system of sewers consisting of a main line sewer and various trunk line sewers connecting or to be connected thereto (which system is hereinafter referred to collectively as the "Farley Sanitary Sewer" or "Sanitary Sewer").
>
> * * *
>
> [Speedway] agrees that the Farley Sanitary Sewer, when so constructed, may be connected to the sewage system of [Speedway] ... and that such connection may be maintained permanently thereafter if the Farleys comply with all of the conditions and obligations imposed on them by this agreement.
>
> * * *
>
> [I]t being the intent of this agreement that [Speedway] shall have the exclusive right to charge owners of property connected through such Sanitary Sewer to the sewage system of [Speedway] for the services rendered thereby.
>
> * * *
>
> The Farleys agree that within twenty-four (24) months from the date of this agreement ... they will convey to [Speedway] the Farley Sanitary Sewer System and any addition or extensions connected therewith.... [Speedway] agrees that after the date of such transfer it will maintain such sanitary sewer.

R. 512–19. As the years progressed to the present day, Speedway entered into similar contracts with other developers who were constructing residential subdivisions and apartments outside Speedway's town limits. In exchange for the sewer service, Speedway charged these out-of-town customers users fees that included the fifty percent (50%) surcharge. There is no dispute that Speedway adequately provided sewage disposal to the out-of-town customers. It is apparent that Speedway obtained such authority and power by contractual agreement. However, the Petitioners argue that the user fees charged to the out-of-town customers of the sewer system are inequitable, unjust, and do not rest on any sufficient basis.

### III. User Fees for Sewer Service

■ Because Speedway exercised its authority in providing sewage disposal service to the out-of-town customers, it clearly had the right to charge the customers fees for the use of this service. *See* Ind. Code § 36–9–2–16. A municipality is entitled to the same privilege of receiving payment for services rendered in the ownership and operation of its sewer system as a private corporation. However, a municipality does not have unbridled discretion in setting user fees for sewage disposal. The Indiana General Assembly has enacted legislation to guide municipalities and control their imposition of user fees for sewage disposal. Indiana Code section 36–9–23–25 provides that:

> (a) The municipal legislative body shall, by ordinance, establish just and equitable fees for the services rendered by the sewage works, and provide the dates on which the fees are due.
>
> (b) Just and equitable fees are the fees required to maintain the sewage works in the sound physical and financial condition necessary to render adequate and efficient service. The fees must be sufficient to:
>
> > (1) pay all expenses incidental to the operation of the works, including legal expenses, maintenance costs, operating charges, repairs, lease rentals, and interest charges on bonds or other obligations;

(2) provide the sinking fund required by section 21 of this chapter;

(3) provide adequate money to be used as working capital; and

(4) provide adequate money for improving and replacing the works.

* * *

Unless the municipal legislative body finds otherwise, the works are considered to benefit every lot, parcel of real property, or building connected or to be connected with the municipal sewer system as a result of construction work under the contract, and the fees shall be billed and collected accordingly.

(d) The municipal legislative body may use one (1) or more of the following factors to establish the fees:

(1) A flat charge for each sewer connection.

(2) The amount of water used on the property.

(3) The number and size of water outlets on the property.

(4) The amount, strength, or character of sewage discharged into the sewers.

(5) The size of the sewer connection.

(6) Whether the property has been or will be required to pay separately for any part of the sewage works.

(7) Whether the property, although vacant or unimproved, is benefited by a local or lateral sewer because of the availability of that sewer. However, the owner must have been notified, by recorded covenants and restrictions or deed restrictions in the chain of title of his property, that a fee or assessment for sewer availability may be charged, and the fee may reflect only the capital cost of the sewer and not the cost of the operation and maintenance of the sewage works.

(8) The cost of collecting, treating, and disposing of garbage in a sanitary manner, including equipment and wages.

(9) The amount of money sufficient to compensate the municipality for the property taxes it would have paid on the sewage works if the sewage works were privately owned.

(10) Any other factors the legislative body considers necessary.

* * *

(e) The municipal legislative body may exercise reasonable discretion in adopting different schedules of fees, or making classifications in schedules of fees, based on variations in:

(1) the costs, including capital expenditures, of furnishing services to various classes of users or to various locations; or

(2) the number of users in various locations.

In addition, Indiana Code section 36–1–3–8(6) (the "Home Rule Statute") provides that a municipality does not have "[t]he power to impose a service charge or user fee greater than that reasonably related to reasonable and just rates and charges for services." We have previously held this portion of the Home Rule Statute and Indiana Code section 36–9–23–25 coexist independently of one another. *Burke v. Town of Schererville,* 739 N.E.2d 1086, 1091 (Ind.Ct.App.2000). Thus, a municipality's imposition of user fees for its sewer system is governed by both statutory provisions.

▬▬ Petitioners challenge on appeal[9] Ordinance No. 924 adopted by

9. The Indiana legislature has permitted a customer of a sewage works to object to sewer charges and appeal the rate determination. Indiana Code section 36–9–23–26.1 allows

Speedway on April 24, 2000. Rules relating to statutory construction are to be applied in construing an ordinance. *Taylor v. Fall Creek Regional Waste District*, 700 N.E.2d 1179, 1184 (Ind.Ct.App.1998), *trans. denied.* Like statutes, ordinances are presumed to be valid, and the party challenging an ordinance bears the burden of proving invalidity. *Id.* The objective in statutory construction is to determine and give effect to the legislative intent. *Matter of Lawrance*, 579 N.E.2d 32, 38 (Ind. 1991). We examine a statute as a whole, giving common and ordinary meaning to the words used. *Id.*

Ordinance No. 924 raised the rates in the amount of 38.35% across the board for use of the municipality's sewer system in order to fund construction of certain improvements and extensions of its sewage works. In addition, Ordinance No. 924 continued the fifty percent (50%) surcharge to out-of-town customers of the sewer system that was originally imposed under Ordinance No. 198. Although the Petitioners do not contest the across the board rate increase, they assert that the disparity between the rates charged to the out-of-town customers as opposed to the in-town customers as a result of the fifty percent (50%) surcharge is unjust, inequitable and in violation of Indiana Code section 36–9–23–25. Essentially the Petitioners argue that the surcharge imposed on out-of-town customers is arbitrary, inequitable, discriminatory, and not supported by a reasonable basis.

It is clear from the text of Indiana Code section 36–9–23–25 that the rates a municipality may charge customers for sewage disposal must be reasonable, just, and equitable. Furthermore, these rates must be fixed by ordinances which are not arbitrary and must be uniform and without discrimination against particular property owners. However, in certain instances it is proper for a municipality to charge a higher rate to users outside a municipality's corporate boundaries than to those within a town's limits. *See* Ind.Code § 36–9–23–25(e).

 A town council has a large measure of discretion in the exercise of its ratemaking power controlled by the statutory standard. *See Geimer v. Center Utilities, Inc.*, 152 Ind.App. 64, 281 N.E.2d 819, 824 (1972). A town council is free to make pragmatic adjustments that may be called for by particular circumstances. *Id.* Indiana Code section 36–9–23–25(e) provides that a municipality has "reasonable discretion" in adopting rate classifications. However, the Indiana legislature has provided only two factors that may justify different classifications of fees: (1) the costs, including capital expenditures, of furnishing services to various classes of users or to various locations; or (2) the number of users in various locations. Ind. Code § 36–9–23–25(e)(1) and (2). It follows that a municipality in Indiana must be able to articulate its reasons for establishing rate classifications, and a municipality may not justify its rate differentials without valid, reliable facts that are supported by some type of evidence. There must be a rational underpinning for the charges levied when rate classifications are established by a municipality.

 We believe that the burden-shifting method of proof is appropriate when a challenge is brought to a munici-

---

owners of property connected to and served by a sewage works to file a written petition objecting to the rates so long as the petitioners attend the public hearing provided by Indiana Code section 36–9–23–26. We note

that the Petitioners followed these statutory procedures in appealing the fifty percent (50%) surcharge contained in the user fees charged by Speedway to out-of-town customers.

pality's imposition of user fees or rates for use of its sewer system. Sewer rates fixed by a municipality in Indiana are presumed to be valid. *See* Ind.Code § 36–9–23–25(b). Thus, the burden initially rests on those who attack a rate ordinance to demonstrate that such rates are arbitrary, inequitable, or discriminatory. Furthermore, a municipality has no duty to justify its actions in setting rates until the burden has shifted as a result of the establishment of a prima facie case of invalidity based upon competent evidence. In addition, merely objecting to a rate ordinance at the hearing pursuant to Indiana Code section 36–9–23–26 or filing a petition to contest a rate ordinance pursuant to Indiana Code section 36–9–23–26.1 is insufficient for purposes of establishing a prima facie case. Evidence sufficient to establish the prima facie case must be examined on a case-by-case basis. Resting the burden of proof ultimately with the municipality is proper considering that the municipality has control of the instrumentality and the records pertaining to sewage disposal and the mandate of Indiana Code section 36–9–23–25 which requires that all rates must be just and equitable. *See, e.g., Geimer,* 152 Ind.App. at 73, 281 N.E.2d at 824; Ind. Code § 36–9–23–25.

■ We believe that the Petitioners presented sufficient evidence to make a prima facie case that the surcharge of fifty percent (50%) levied upon the out-of-town customers of the sewer system was arbitrary, inequitable, and discriminatory. The surcharge was imposed on the out-of-town customers from February 15, 1954, when Speedway adopted Ordinance No. 198. The surcharge remained unchallenged for more than forty-five years. We have previously held that the fact that a rate structure had been in effect for a long time without complaint is sufficient to establish a prima facie case of reasonableness as between the classes of customers. *City of Terre Haute v. Terre Haute Water Works Corp.,* 133 Ind.App. 232, 180 N.E.2d 110, 117 (1962). However, evidence presented at trial established that many of the out-of-town customers of the sewer system were unaware of the surcharge until Speedway introduced Ordinance No. 924 to the general public. Therefore, the length of time which has elapsed since the surcharge was implemented actually supports the Petitioners' prima facie case. This is especially true because the Indiana legislature did not enact Indiana Code section 36–9–23–25(e), which specifically requires a municipality to justify its rate classifications, until 1981.

Moreover, the Petitioners presented expert testimony at trial that established that the imposition of the surcharge was arbitrary, inequitable, and discriminatory against the out-of-town customers of Speedway's sewer system. Otto Krohn, a certified public accountant whose practice is primarily focused on government utilities, testified that Speedway failed to substantiate the surcharge and that a cost-of-service study was needed in order to properly determine the rate to charge the out-of-town customers of the sewer system. He testified that the standard practice when creating a rate classification is to conduct a cost-of-service study. Krohn explained that a cost-of-service study involves a team of professionals including accountants, lawyers, and engineers. According to Krohn, in conducting the cost-of-service study the team would examine the differentiation of costs between in-town and out-of-town customers, and the focus would be on the difference in the collection system costs because the other costs would be the same for all of the customers of the sewer system.

Krohn stated at trial that changes in circumstances generally require a munici-

pality to perform a cost-of-service study to justify proposed rates. Moreover, he testified that the passage of time could necessitate a cost-of-service study and that in his opinion it is both proper and reasonable to conduct such a study every ten years. According to Krohn, a customer challenge to a rate ordinance may also require that a cost-of-service study be performed. In Krohn's opinion, Speedway was absolutely required to conduct a cost-of-service study before implementing Ordinance No. 924: (1) because the population of the serviced area had grown over the past forty-five years; (2) because a cost-of-service study had never been performed by the municipality; and (3) in order to justify the surcharge as a result of the challenge by the out-of-town customers.

In addition, Krohn testified at trial that there was no difference in cost to treat the waste received from outside Speedway's corporate boundaries compared to that received from inside the town's limits. Based upon Speedway's rate study, Krohn testified that less than five percent (5%) of requested revenues were related to the collection system. He stated that any cost, including capital expenditures to furnish the service to the outside customers, had been funded by the out-of-town customers many years earlier. Krohn further testified at trial that the difference in density between the out-of-town residents and the in-town residents was only five percent (5%). Thus, the number of users of the sewer system outside Speedway's corporate boundaries did not justify the imposition of the fifty percent (50%) surcharge. Based upon the length of time that has elapsed since the surcharge was implemented and Krohn's trial testimony, we believe that the burden shifted to Speedway to justify the fifty percent (50%) surcharge imposed on the out-of-town customers of the municipality's sewer system.

During its case-in-chief, Speedway called its rate consultant, John Skomp, to the stand to substantiate the continued imposition of the fifty percent (50%) surcharge upon the out-of-town customers of its sewer system. Skomp prepared a Rate and Financing Report for Speedway dated March 27, 2000, to assist the town in setting rates. This document was introduced as evidence at trial. Our review of the Rate and Financing Report reveals that it provides justification for the across the board rate increase of 38.35% to all customers of the sewer system which was implemented by Ordinance No. 924. However, the document provides no justification for the additional fifty percent (50%) surcharge imposed on the out-of-town customers.

Skomp testified at trial that he did not conduct a cost-of-service study prior to the adoption of Ordinance No. 924 because he did not believe that it was necessary. The Petitioners elicited testimony from Skomp which established that he believed a cost-of-service study normally resulted in a set of rates and charges that were fair and equitable to all customers of a municipal sewer system even though a municipality implemented a rate classification. Skomp testified that he had heard that Speedway conducted a cost-of-service study in 1975 but that he had never examined the report. The 1975 report entitled Rate Analysis Sewage Treatment Works was admitted into evidence at trial. Our review of the 1975 report reveals that it provides justification for an across the-board rate increase but not the fifty percent (50%) surcharge imposed on the out-of-town customers.

However, Skomp presented a document entitled Preliminary Analysis that he had prepared prior to trial to justify the surcharge imposed on sewer customers living outside Speedway's limits. This document

was admitted into evidence. Although the report does provide differentials between the out-of-town customers and the in-town customers, it does not provide a sufficient nexus between the surcharge and the costs, including capital expenditures, for furnishing sewage disposal services to the out-of-town customers. Furthermore, Skomp testified at trial that the surcharge was justified to account for the additional operation and maintenance costs associated with providing sewage outside Speedway's corporate boundaries. Although such costs may in fact exist, Skomp did not provide a link between the increased costs and the fifty percent (50%) surcharge levied on the out-of-town customers of the sewer system.

■ It is apparent from the record that the surcharge was imposed initially to pay for the infrastructure needed to provide sewage disposal to the out-of-town customers.[10] However, the amount of the surcharge has remained unchanged for a significant period of time. At trial, Speedway failed to link or correlate the fifty percent (50%) surcharge to increased costs for the infrastructure or the costs of providing sewage disposal to customers outside the town's corporate limits. Merely expounding or listing the differentials or increased costs associated with providing sewage disposal to out-of-town customers is insufficient for purposes of justifying a rate classification. There must be some connection between the differentials and the surcharge imposed upon a customer class. A municipality may not randomly or arbitrarily pick a number as the amount of surcharge to impose upon a certain class of users it has created. We do not believe that a municipality is bound by mathematical certainty in linking increased costs to the calculation of the surcharge to impose as a result of the creation of a rate classification, but the surcharge must be reasonably related to the increased costs of the service.

Evidence presented at trial established that a cost-of-service study is an established and effective means of determining the increased costs associated with the connection of a municipality's sewer system to areas outside its corporate boundaries. Such a study would provide the means of determining the amount of surcharge, if any, to be imposed on the out-of-town customers so that the residents of the town did not bear the burden of non-resident use. Although we do not hold that Speedway was required to conduct such a study, the municipality clearly had the duty to justify its rate classification with some form of competent evidence. Other methodologies may exist which would substantiate the amount of the surcharge levied upon out-of-town customers of Speedway's sewer system.

We believe that the Speedway town council, without a valid basis, chose fifty percent (50%) as the amount of surcharge to levy upon the out-of-town customers for use of its sewer system. Therefore, the surcharge imposed upon the nonresident users of Speedway's sewer system is arbitrary, inequitable, and discriminatory. The town council, with impunity from the out-of-town customers, has been able to maintain the surcharge in full force and effect for more than forty-five years without sufficient justification. Thus, we hold that the surcharge of fifty percent (50%) levied upon the out-of-town customers of Speedway's sewer system violates the statutory provisions of Indiana Code section

10. For instance, the wastewater treatment plant constructed in 1955 and the additions to the plant in 1972. R. 635.

36–9–23–25 and Indiana Code section 36–1–3–8(6).

 Although it is clear that utility rate making by municipalities is a legislative function reviewable by courts, the authority of courts in such matters is limited to making a judicial determination as to the validity of such rate ordinances. *See State ex rel. City of Marion v. Grant Circuit Court,* 239 Ind. 315, 157 N.E.2d 188, 189–90 (1959). We have previously stated that "courts have not power at law to set a proper sewer rate in the first instance or to change a sewer rate to a level which may be deemed proper." *Underwood v. City of Jasper Mun. Utility Serv. Bd.,* 678 N.E.2d 1280, 1285 (Ind.Ct. App.1997), *trans. denied.* Therefore, we are precluded from setting a just and equitable rate to be charged to the out-of-town customers. Thus, we reverse the trial court's order affirming the portion of Ordinance No. 924 [11] that levies the surcharge of fifty percent (50%) on the out-of-town customers Speedway's sewer system.[12]

### Conclusion

Based on the foregoing, we hold that the trial court erred in affirming the portion of Ordinance No. 924 enacted by Speedway which levied a surcharge of fifty percent (50%) upon the out-of-town customers of its sewer system.

Reversed.

BROOK and VAIDIK, JJ., concur.

---

**11.** It is unclear whether Ordinance No. 198 which originally levied the surcharge of fifty percent (50%) upon the out-of-town customers of the sewer system has been repealed or was replaced by the town council's enactment of Ordinance No. 924. If Ordinance No. 198 is still in full force and effect, this opinion deems it invalid because Speedway failed to substantiate or justify the surcharge.

**12.** Therefore, both the in-town and out-of-town customers must be charged the same rate until Speedway presents competent evidence to support a rate classification.